PER CURIAM.
In this appeal, this court considers whether a circuit court may constitutionally award grandparents visitation with their grandchildren over the objection of the children’s fit, natural,[1] custodial parents without providing clear and convincing evidence that the denial of such visitation would cause the children substantial harm. The Alabama Grandparent Visitation Act
The Grandparent Visitation Act (“the Act”), Ala.Code 1975, § 30-3-4.1, provides, in pertinent part:
“(b) Except as otherwise provided in this section, any grandparent may file an original action for visitation rights to a minor child if it is in the best interest of the minor child and one of the following conditions exist:
[[Image here]]
“(5) When the child is living with both biological parents, who are still married to each other, whether or not there is a broken relationship between either or both parents of the minor and the grandparent and either or both parents have used their parental authority to prohibit a relationship between the child and the grandparent.
[[Image here]]
“(d) Upon the filing of an original action ..., the court shall determine if visitation by the grandparent is in the best interests of the child. Visitation shall not be granted if the visitation would endanger the physical health of the child or impair the emotional development of the child. In determining the best interests of the child, the court shall consider the following:
“(1) The willingness of the grandparent or grandparents to encourage a close relationship between the child and the parent or parents.
“(2) The preference of the child, if the child is determined to be of sufficient maturity to express a preference.
“(3) The mental and physical health of the child.
“(4) The mental and physical health of the grandparent or grandparents.
“(5) Evidence of domestic violence inflicted by one parent upon the other parent or the child. If the court determines that evidence of domestic violence exists, visitation provisions shall be made in a manner protecting the child or children, parents, or grandparents from further abuse.
“(6) Other relevant factors in the particular circumstances, including *617 the wishes of any parent who is living.”
As construed by this court, in considering “the wishes of any parent who is living,” pursuant to § 30 — 3-4.1(d)(6), the deciding court must presume that the decision of a parent whether to allow grandparent visitation serves the best interest of a child and the court may award visitation only when the petitioning grandparent adduces clear and convincing evidence overcoming that presumption. See L.B.S. v. L.M.S., 826 So.2d 178 (Ala.Civ.App.2002) (plurality opinion authored by Thompson, J., with Pittman, J., concurring; Yates, P.J., and Murdock, J., concurring in the result; and Crawley, J., dissenting); see also J.W.J. v. P.K.R., 976 So.2d 1035, 1039-40 (Aa.Civ.App.2007).

Past Treatment of the Harm Standard

The Act provides that grandparent visitation should not be allowed when it would endanger the physical health or impair the emotional development of a child, but the Act does not expressly require a petitioning grandparent to prove that the denial of the requested visitation would cause harm to the child. In R.S.C. v. J.B.C., 812 So.2d 361 (Ala.Civ.App.2001) (plurality opinion), a case considering the constitutionality of § 30-3-4.1 as it existed before 2003, then Judge Murdock stated in the main opinion, which only Judge Pittman joined, that the state has a compelling interest in preventing harm to children and that the Act was unconstitutional because it did not require proof of “harm or potential harm to the child if such visitation [was] not allowed.” 812 So.2d at 372.
A year later, in L.B.S. v. L.M.S., supra, the court again addressed the constitutionality of the pre-2003 Act. Judge Thompson, in an opinion joined by Judge Pittman, wrote:
“[A] grandparent seeking visitation bears the burden of showing, by clear and convincing evidence, that the best interest of the child is served by awarding grandparent visitation. We note that harm or detriment is always a factor to be considered in a best-interest analysis.”
826 So.2d at 186. Judge Murdock concurred in the judgment of reversal only, stating:
“In general, to fall within the more limited class of cases to which I believe the statute constitutionally may be applied, there must be a threshold showing of substantial harm to the child if the requested visitation is not granted, and this showing must be made by clear and convincing evidence.”
826 So.2d at 188. Presiding Judge Yates concurred with Judge Murdock’s reasoning. Id. As a result, a majority of the court agreed that the Act could be constitutionally applied in cases in which the petitioning grandparent proved by clear and convincing evidence that a denial of the requested visitation would cause substantial harm to the child, 826 So.2d at 186 n. 5. However, a majority of the court did not agree that grandparent visitation could be awarded solely upon a sufficient showing that the denial of visitation would result in substantial harm to the child. Id.; see also A.M.K. v. E.D., 826 So.2d 889 (Ala.Civ.App.2002) (adopting reasoning of L.B.S.). Nevertheless, in the next few opinions this court issued concerning the Act, the court reversed judgments awarding grandparent visitation, or affirmed judgments denying grandparent visitation, when the record did not disclose clear and convincing evidence demonstrating that the child would be substantially harmed if visitation was denied. See Beck v. Beck, 865 So.2d 446, 449 (Ala.Civ.App.2003) (Yates, P.J., with Thompson, Pittman, and *618 Murdock, JJ., concurring in the result; and Crawley, J., dissenting) (dicta); Richburg v. Richburg, 895 So.2d 311, 318 (Ala.Civ.App.2004); and C.D.P. v. D.P., 927 So.2d 841 (Ala.Civ.App.2005).
In 2003, the Alabama Legislature amended the Act to its present form, as quoted in part above. Ala. Acts 2003, Act No. 2003-383, § 1, p. 1084. As shown, the amended Act does not expressly require a petitioning grandparent to prove that a child would be harmed in order to overcome the presumption that a fit parent’s decision regarding grandparent visitation serves the best interests of the child. In Dodd v. Burleson, 932 So.2d 912 (Ala.Civ.App.2005) (plurality opinion) (“Dodd, I”), Judge Pittman, in an opinion joined by Judge Thompson, interpreted that omission, as well as the maintenance of the best-interest language, as a legislative rejection of the harm standard established in L.B.S., 932 So.2d at 919. Judge Pittman went on to state that due process does not require a showing of harm in all cases as a prerequisite to a judgment awarding grandparent visitation. 932 So.2d at 920. However, the father in Dodd I had not preserved his constitutional challenge to the amended Act, so the majority of the court determined that Judge Pittman’s statements regarding due-process requirements constituted dictum. 932 So.2d at 922-23 (Crawley, P.J., concurring in the result, joined by Bryan, J.; and Murdock, J., concurring in the result). Later, on appeal after remand, a majority of the court maintained that the issue whether due process requires a showing of harm to overcome a fit parent’s decision regarding grandparent visitation could not be decided because that issue was not properly before the court. Dodd v. Burleson, 967 So.2d 715, 726 (Ala.Civ.App.2007) (“Dodd II”) (Moore, J., concurring in the result, joined by Bryan and Thomas, JJ.); see also J.W.J., 976 So.2d at 1042 n.3 (noting that the issue remained undecided).

The Facts and, Procedural History

The issue now presents itself squarely for our review in the context of an appeal from a judgment of the Jefferson Circuit Court (“the trial court”) awarding grandparent visitation over the objection of fit, natural, custodial parents. Briefly, the underlying facts, when viewed in a light most favorable to the findings of fact entered by the trial court, show that E.H.G. and C.L.G. (“the parents”) were married in 1995 and that their marriage produced two children, G.C.G., who was born in 1996, and A.K.G., who was born in 1997. E.R.G. and D.W.G. (“the paternal grandparents”) enjoyed what the trial court characterized as a loving relationship with the children for most of their young lives. The testimony of several witnesses indicates that D.W.G. (“the paternal grandmother”), largely with the consent or acquiescence of the parents, took a particularly active role in rearing the children, including fostering relationships between the children and their extended paternal family and friends. C.L.G. (“the mother”) testified that when the children were very young, the two families had basically blended together and had acted as a single unit, with the paternal grandmother asserting a great deal of control over the care of the children, sometimes even in violation of the mother’s desires. However, beginning in the spring of 2004, around the time the paternal grandparents, who had long supported the parents, began having financial problems, the parents began curtailing the time the children spent with the paternal grandparents. According to the testimony of the paternal grandparents, which the trial court found to be accurate, in February 2005, after the paternal grandparents withheld from the parents the proceeds from the sale of inventory from the busi *619 ness operated by E.H.G. (“the father”) and E.R.G. (“the paternal grandfather”), the parents forbade the paternal grandparents from visiting with the children. The parties submitted to family counseling to resolve their impasse, which resulted temporarily in an agreement allowing the paternal grandparents to visit with the children four hours per week, subject to certain guidelines as to the children’s care; however, after three or four months, the parents terminated that arrangement. The paternal grandparents have had little to no personal interaction with the children since that time, but they have placed signs communicating their continued love for the children on the route to the children’s school and have seen the children at public events, such as the children’s softball games.
The paternal grandparents filed a petition seeking visitation under the Act on June 25, 2007. In their answer to the petition, the parents alleged that the Act was unconstitutional on its face and as applied to them. The parents served the attorney general with their constitutional challenge, and the attorney general waived further participation in the proceedings in the trial court. See Ala.Code 1975, § 6-6-227. The trial court subsequently appointed a guardian ad litem to represent the children. See Ala.Code 1975, § 30-3-4.1(f). The trial court then conducted a bench trial on April 29, 2008. During that trial, the trial court heard testimony from the parties and several of their relatives, friends, and acquaintances and it examined the children in camera outside the presence of the parties. Following the trial, the trial court received a report from the guardian ad litem containing his assessment that “a properly structured, clearly defined, and initially court-monitored visitation arrangement with the paternal grandparents” would serve the best interests of the children.
On May 30, 2008, the trial court entered a judgment containing detailed findings of fact and conclusions of law. See Ala.Code 1975, § 30-3-4.1(e). In its conclusions of law, the trial court stated:
“The Court therefore recognizes the presumption that the [parents’] wishes are presumed to be in the best interests of their children.... [The paternal grandparents’] burden under the statute is to thus overcome the said presumption, through the presentation of clear and convincing evidence, that the [parents’] wishes to terminate exposure of their children to their paternal grandparents is in the best interests of the said minor children.”
Among its findings of fact, the court determined:
“4. The Court’s interview of the said grandchildren leaves the Court with the impression during the receipt of testimony from the witnesses that the said grandchildren are perfectly normal, happy, active, intelligent young ladies. The only topic which causes them to pause and to become quiet and withdrawn is the subject of the ongoing dispute between their parents and paternal grandparents.
[[Image here]]
“14. The extreme control that is currently exercised by [the parents] with regard to restricting access of the paternal grandparents to their children and, which is meant to be directed toward [the paternal grandparents], has had the effect of:
“a. Completely alienating the minor children from their paternal grandparents, with whom they had previously established strong relationships.
“b. Severely restricting the minor children from their established relationships with their extended paternal fami *620 ly which includes many aunts, uncles, cousins as well as their own godmothers.
“c. Severely restricting the minor children from relationships with friends, which friendships were nurtured as a part of their relationship with their paternal grandparents.
“d. Has been a contributing cause, along with the ever more bizarre efforts of [the paternal grandparents] to overcome the restrictions, in destroying the relationship between the parent[s] and paternal grandparent[s].
[[Image here]]
“These said minor children are now 10 and 12 years old respectively and have been isolated from their paternal grandparents for approximately 3 years, so that they were approximately 7 and 9 years old, respectively, at the time of alienation. From the record, the Court can find nothing to base a finding that exposure to [the paternal grandparents] would retard their ' emotional development. The said minor children appear to be well adjusted normal children whose only cause for consternation and despair is the strained relations between the parents and paternal grandparents.
“Indeed, the Court finds that the continuation of the alienation between the parents and paternal grandparents is of greater potential harm to the said minor children’s emotion[al] development than any other factor in their lives at this point in time.
[[Image here]]
“With regard to the mental and physical health of the said minor children, the greatest detriment, the Court finds, is the ongoing unregulated dispute between their parents and paternal grandparents.”
The trial court analyzed the facts of the case in accordance with the factors set out in § 30 — 3—4.1 (d) (1) — (6) in order to determine whether the best interests of the children would be served by awarding grandparent visitation. Concluding that those factors militated in favor of awarding grandparent visitation, the trial court stated:
“The Court therefore, after having engaged the presumption in favor of the ... parents, is convinced, through clear and convincing evidence, that the [parents’] exertion of control over the lives of the children to the extent of isolating them from their relationship with their grandparents and alienating them from an otherwise loving relationship is not in the best interest of the said minor children.”
Based on that conclusion, the trial court awarded the paternal grandparents in-person visitation with the children on each Friday (from 3:00 p.m. to 6:30 p.m. when school is not in session and from 3:30 p.m. to 6:30 p.m. when school is in session); on the day before each child’s birthday each year; and on December 25 (from 1:00 p.m. to 6:00 p.m.) each year. Additionally, the trial court ordered daily telephonic communication between the paternal grandparents and the children.
Following entry of the judgment, the parents filed a motion to alter, amend, or vacate the judgment, pursuant to Rule 59, Ala. R. Civ. P., asserting, among other grounds, that the Act “violates due process by failing to require a showing of harm to the children as a condition precedent to the award of visitation.” Before the trial court could rule on that motion, the children visited with the paternal grandparents on June 14, 2008. The parents subsequently moved the court to stay further visitation pending this appeal on the ground that the Act had been applied unconstitutionally to them and that the onetime visitation had been a “horrific experience” that had placed the children in a *621 “terrifying situation.” The trial court conducted an ore tenus hearing on July 2, 2008, after which it denied the Rule 59 motion and the motion to stay. The parents then timely appealed to this court. Following the filing of their notice of appeal, the parents again moved the trial court to stay its judgment, which motion the trial court granted on August 8, 2008. This court heard oral argument on this appeal on January 12, 2010.

Discussion

The Fourteenth Amendment to the United States Constitution provides that no state shall “deprive any person of life, liberty, or property without due process of law.” The United States Supreme Court has recognized that the term “liberty” refers not only to freedom from bodily restraint, but also to freedom from undue governmental interference with certain fundamental rights and liberty interests. Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). Among the fundamental rights protected by the Fourteenth Amendment is the right of fit natural parents to the care, custody, and control of their children, Griggs v. Barnes, 262 Ala. 357, 363, 78 So.2d 910, 916 (1955) (“ ‘ “The essence of custody is the companionship of the child and the right to make decisions regarding his [or her] care and control, education, health, and religion.” ’ ” (quoting In re Guardianship of Smith, 255 P.2d 761, 762 (Cal.1953), quoting in turn Lemer v. Superior Court of San Mateo County, 38 Cal.2d 676, 681, 242 P.2d 321, 323 (1952))), which right includes the power to determine with whom their children associate. See Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). That right, being “fundamental,” is not conferred by the state upon natural parents but arises as an inherent consequence of the parent-child relationship independent of any caselaw, statute, or constitutional provision, see Troxel, 530 U.S. at 91 (Scalia, J., dissenting) (opining that the right to direct upbringing of child is one of the “ ‘unalienable Rights’ ” referred to in the Declaration of Independence and one of the “ ‘othe[r] [rights] retained by the people’” in the Ninth Amendment to the United States Constitution), as an intrinsic human right, Smith v. Organization of Foster Families, 431 U.S. 816, 845, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), “implicit in the concept of ordered liberty,” Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937), overruled on other grounds, Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), that is “ ‘rooted in the traditions and conscience of our people.’ ” See Michael H. v. Gerald D., 491 U.S. 110, 122, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (quoting Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934) (Cardozo, J.), overruled in part on other grounds, Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)).
The United States Supreme Court has long maintained that “the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.” Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944). Alabama courts have also endorsed the concept that parental authority over a child’s associations flows naturally from the “sacred duty” of rearing children. See Montgomery v. Hughes, 4 Ala.App. 245, 247, 58 So. 113, 113 (1911). As Justice Souter explained in his opinion concurring in the judgment in Troxel:
“The strength of a parent’s interest in controlling a child’s associates is as obvious as the influence of personal associations on the development of the child’s social and moral character. Whether *622 for good or for ill, adults not only influence but may indoctrinate children.... ”
530 U.S. at 78. Hence, the law traditionally has recognized that a parent charged with the responsibility of preparing a child for social and other obligations should be able to determine who should influence or indoctrinate that child. See Ex parte Bronstein, 434 So.2d 780, 782 (Ala.1983).
Out of respect for that fundamental natural right, the common law declared that fit parents did not have any legal obligation to allow grandparent visitation. See id.
“The policy reasons underlying the common law rule’s recognition of a parent’s right to deny grandparents visitation with their grandchildren included the following:
“1) A parent’s obligation to allow grandparent visitation is moral, not legal;
“2) Judicial enforcement of grandparent visitation divides and hinders parental authority;
“3) Producing a conflict of authority between grandparent and parent is not in the ‘best interest of the child;’
“4) A parent alone should judge whether visitation with grandparents is appropriate;
“5) Natural relations, and not judicial intervention, are the only effective means of restoring normal family relations.”
Cody L. Balzer, Note, Grandparent Visitation Rights — Constitutional Considerations and the Need to Define the "Best Interests of the Child’’ Standard — Goff v. Goff, 844 P.2d 1087 (Wyo.1993), 29 Land & Water L.Rev. 593, 595 (1994). Alabama caselaw largely adhered to the common-law precepts, recognizing that, absent an agreement by the parents, a grandparent has no legal right to visitation. See Brock v. Brock, 281 Ala. 525, 533, 205 So.2d 903, 910 (1967); and Phillips v. Phillips, 53 Ala.App. 191, 298 So.2d 613 (1974) (affirming judgment authorizing parents of divorced father to pick up child on behalf of father insofar as that provision did not grant the grandparents visitation rights). This court has found only one Alabama case in which the appellate courts of this state affirmed a judgment awarding grandparents visitation over the objection of a fit parent, see Kewish v. Brothers, 279 Ala. 86, 181 So.2d 900 (1966); that case has been described as an “aberration.” Richburg, 895 So.2d at 315 n. 2.
Because of the longstanding recognition of the parental right to deny grandparent visitation, and due to its fundamental nature, that right may not be denied by a state actor without due process of law. See Troxel, 530 U.S. at 65-66. In that regal’d, “due process” means more than simply a guarantee of “fair process,” see Glucksberg, supra; it entails a substantive component that provides that any state statute interfering with a fundamental right of its citizens must be narrowly tailored to further a compelling governmental interest. See Smith v. Schulte, 671 So.2d 1334 (Ala.1995), abrogated on other grounds, Ex parte Apicella, 809 So.2d 865 (Ala.2001); see also L.B.S., supra.
In In re Custody of Smith, 137 Wash.2d 1, 969 P.2d 21 (1998), the Washington Supreme Court declared that the only compelling interest that would justify the state in overriding the decision of a fit parent whether to allow grandparent visitation is the interest of the state in protecting children from harm. 137 Wash.2d at 15-16, 969 P.2d at 28. In reviewing Smith, the United States Supreme Court in Troxel, supra, refused to address that question. 530 U.S. at 73. A few courts have seized *623 on that silence as a rejection of the harm standard espoused in Smith and as a recognition that the state may act to award grandparent visitation when sufficiently proven by the petitioning grandparent to be in the best interests of the child. See, e.g., In re Adoption of C.A., 137 P.3d 318 (Colo.2006); Vibbert v. Vibbert, 144 S.W.3d 292 (Ky.Ct.App.2004); Rideout v. Riendeau, 761 A.2d 291 (Me.2000); Blakely v. Blakely, 83 S.W.3d 537 (Mo.2002); In re Marriage of O’Donnell-Lamont, 337 Or. 86, 91 P.3d 721 (2004); and Hiller v. Fausey, 588 Pa. 342, 904 A.2d 875 (2006). As he did in Dodd I and Dodd II, in his dissent in this case, 73 So.3d at 630-31, Judge Pittman relies on some of those cases to support his position that due process does not require a showing of harm to the child from the denial of grandparent visitation.
However, the refusal of the Troxel Court to address the issue cannot be construed either as a rejection of the harm standard or as an endorsement of the best-interest standard applied in C.A., Vibbert, Rideout, Blakely, O’Donnel-Lamont, and Hiller, supra. The United States Supreme Court long ago recognized that parental authority “may be subject to limitation ... if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.” Wisconsin v. Yoder, 406 U.S. 205, 234, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). By not restating that standard because that point was unnecessary to its holding, the Troxel Court certainly did not imply that it was abandoning that longstanding position.
A majority of the Troxel Court also agreed that a statute violates due process if it authorizes “a court [to] disregard and overturn any decision by a fit custodial parent concerning visitation ... based solely on the judge’s determination of the child’s best interests.” Troxel, 530 U.S. at 67. By applying a presumption that a parent’s decision regarding grandparent visitation serves the best interests of the child, and by requiring grandparents to overcome that presumption by proving through clear and convincing evidence that grandparent visitation is in the best interests of the child, the court may alter procedural law, but it does not change the applicable substantive standard. Under the best-interest standard applied in C.A., Vibbert, Rideout, Blakely, O’Donnell-Lamont, and Hiller, supra, a trial judge, in violation of due process, remains authorized to overturn the decision of a fit, natural, custodial parent concerning grandparent visitation based on the judge’s conviction that, despite the parents’ assessment, grandparent visitation serves the best interests of the child.
An interest is not a “compelling governmental interest” when the state acts selectively to protect that interest but “ ‘leaves appreciable damage to that supposedly vital interest unprotected.’ ” Church of the Lukumi Babalu, Aye, Inc. v. City of Hialeah, 508 U.S. 520, 547, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (quoting Florida Star v. B.J.F., 491 U.S. 524, 541-42, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (Scalia, J., concurring in part and concurring in the judgment)). Other than the Act at issue in this case, the parties have not directed this court to any other state statute that empowers a court or a state agency to override the decision of a fit, natural, custodial parent regarding the care or control of his or her child based solely on a determination that the parental decision does not serve the best interests of the child. Caselaw generally holds that state courts have no jurisdiction to resolve disputes between two fit, natural, custodial parents regarding the best interests of their child. See Kilgrow v. Kilgrow, 268 Ala. 475, 107 So.2d 885 (1958). In Kilgrow, two fit mar *624 ried parents with equab custodial rights in their child became embroiled in a dispute as to where the child would attend school. On a petition of the father seeking to enjoin the mother from interfering with the father’s choice, the lower court, sitting as an equity court, assumed jurisdiction of the matter on the theory that the right of a parent to direct the education of a child was “ ‘subject to review and correction by the court if not exercised for the best welfare of the child.’ ” 268 Ala. at 478, 107 So.2d at 887. The lower court held that the decision of a father would be considered prima facie correct but that a mother could present evidence to rebut that presumption by “ ‘proper proof,’ ” id., presumably by evidence indicating that the best interests of the child would be served by a contrary decision. On appeal, our supreme court disagreed, stating:
“It seems to us, if we should hold that equity has jurisdiction in this case such holding will open wide the gates for settlement in equity of all sorts and varieties of intimate family disputes concerning the upbringing of children. The absence of cases dealing with the question indicates a reluctance of the courts . to assume jurisdiction in disputes arising out of the intimate family circle. It does not take much imagination to envision the extent to which explosive differences of opinion between parents as to the proper upbringing of their children could be brought into court for attempted solution.
“In none of our cases has the court intervened to settle a controversy between unseparated parents as to some matter incident to the well-being of the child, where there was no question presented as to which parent should have custody. In all of our cases the real question has been which parent should properly be awarded custody. Never has the court put itself in the place of the parents and interposed its judgment as to the course which otherwise amicable parents should pursue in discharging their parental duty. Here, the sole difference between the parties is which school the child should attend. And, that difference seems not to have affected the conjugal attitude of the parents one to the other.
“The inherent jurisdiction of courts of equity over infants is a matter of necessity, coming into exercise only where there has been a failure of that natural power and obligation which is the province of parenthood. It is a jurisdiction assumed by the courts only when it is forfeited by a natural custodian incident to a broken home or neglect, or as a result of a natural custodian’s incapacity, unfitness or death. It is only for compelling reason that a parent is deprived of the custody of his or her child. The court only interferes as between parents to the extent of awarding custody to the one or the other, with the welfare of the child in mind. And it is in awarding custody that the court invokes the principle that the welfare of the child is the controlling consideration. We do not think a court of equity should undertake to settle a dispute between parents as to what is best for their minor child when there is no question concerning the child’s custody.
“It would be anomalous to hold that a court of equity may sit in constant supervision over a household and see that either parent’s will and determination in the upbringing of a child is obeyed, even though the parents’ dispute might involve what is best for the child. Every difference of opinion between parents concerning their child’s upbringing necessarily involves the question of the child’s best interest.
*625 “What was said in Knighton v. Knighton, 252 Ala. 520, 525, 41 So.2d 172, 175 [ (1949) ], is equally pertinent'here:
“ ‘It intrigues the imagination to contemplate the lengths to which such a power once attempted may be carried, and the difficulty to be encountered in the enforcement of such a decree. Considerations of policy and expediency forbid a resort to injunc-tive relief in such a case.’
“It may well be suggested that a court of equity ought to interfere to prevent such a direful consequence as divorce or separation, rather than await the disruption of the marital relationship. Our answer to this is that intervention, rather than preventing or healing a disruption, would quite likely serve as the spark to a smoldering fire. A mandatory court decree supporting the position of one parent against the other would hardly be a composing situation for the unsuccessful parent to be confronted with daily. One spouse could scarcely be expected to entertain a tender, affectionate regard for the other spouse who brings him or her under restraint. The judicial mind and conscience is repelled by the thought of disruption of the sacred marital relationship, and usually voices the hope that the breach may somehow be healed by mutual understanding between the parents themselves.”
268 Ala. at 479-80, 107 So.2d at 888-89
Even in cases of divorce involving fit parents, statutory law generally demands that a trial court vest one of the parties with authority over the decisions affecting the best interests of the child by either granting one party custody of the child, see Ala.Code 1975, § 30-3-1, with its concomitant right to control the child, see Griggs v. Barnes, supra, or by expressly dividing that authority when awarding joint custody. See Ala.Code 1975, § 30-3-151. Once custody is decided, the trial court does not thereafter assume the role of a “superparent” by subjecting the custodial parent’s decisions to its review and correction based on the court’s notion of the best interests of the child. When a trial court is faced with a dispute between two fit divorced parents with equal custodial authority, a state court’s jurisdiction is limited to determining which of the plans submitted by the parents serves the best interests of the child. See Morgan v. Morgan, 964 So.2d 24, 31 (Ala.Civ.App.2007) (“A trial court exercising the power of the state may not usurp the role of the parent and unilaterally compel any particular form of education; however, as the arbiter of custody disputes, the trial court may decide which of the competing plans proffered by the custodial parents is in the best interests of the child, considering the child’s educational needs, and the court may enter a valid, enforceable order in that regard.”). The general absence of legal authority over the decisions of fit, natural custodial parents regarding the raising of their children indicates that the state has no compelling interest in that regard.
On the other hand, statutory law is replete with legislative efforts to prevent children from harmful parental decisions. State laws require parents to restrain their children when the children are riding as passengers in automobiles. Ala.Code 1975, § 32-5-222. State law authorizes the removal of a child from the home of a parent when parental conduct threatens the health or safety of the child, Ala.Code 1975, § 12-15-102, or renders the child dependent. Ala.Code 1975, § 12-15-128. The state may even terminate parental rights to protect a child from harm emanating from the parent-child relationship. Ala.Code 1975, § 12-15-319. Under Ala- *626 baraa caselaw, parental custody may be lost to a third party only due to unfitness or forfeiture, both of which implicate harm to the child. See, e.g., Ex parte Terry, 494 So.2d 628 (Ala.1986). The state also routinely regulates school attendance and restricts child labor to avoid significant social problems. See Prince, 321 U.S. at 166. Hence, in Yoder, supra, the Supreme Court recognized only those two governmental interests — preservation of the health and safety of children and avoidance of social burdens — as compelling.
Caselaw from other jurisdictions has not identified any social burden alleviated by grandparent-visitation statutes. When assessing the constitutionality of grandparent-visitation statutes under either state or federal law, a majority of courts, including some that have expressly rejected the reasoning of the cases upon which the dissent relies, see, e.g., Roth v. Weston, 259 Conn. 202, 789 A.2d 431 (2002); and In re Parentage of C.A.M.A., 154 Wash.2d 52, 109 P.3d 405 (2005), have concluded that the only compelling interest justifying such laws is the prevention of harm to the child. See Linder v. Linder, 348 Ark. 322, 72 S.W.3d 841 (2002); Cranney v. Coronado, 920 So.2d 132, 134 (Fla.Dist.Ct.App.2006); Brooks v. Parkerson, 265 Ga. 189, 193 n. 5, 454 S.E.2d 769, 773 n. 5 (1995); Doe v. Doe, 116 Haw. 323, 172 P.3d 1067 (2007); Lulay v. Lulay, 193 Ill.2d 455, 739 N.E.2d 521, 250 Ill.Dec. 758 (2000); In re Marriage of Howard, 661 N.W.2d 183 (Iowa 2003); Koshko v. Haining, 398 Md. 404, 921 A.2d 171 (2007); Blixt v. Blixt, 437 Mass. 649, 774 N.E.2d 1052 (2002); Moriarty v. Bradt, 177 N.J. 84, 827 A.2d 203 (2003); In re Herbst, 971 P.2d 395, 399 (Okla.1998); Camburn v. Smith, 355 S.C. 574, 586 S.E.2d 565 (2003); Glidden v. Conley, 175 Vt. 111, 820 A.2d 197 (2003); and Williams v. Williams, 256 Va. 19, 501 S.E.2d 417, 418 (1998). Pursuant to the reasoning of those cases, a court cannot award grandparent visitation without clear and convincing evidence demonstrating that denial of the requested visitation would harm the child.
In Hawk v. Hawk, 855 S.W.2d 573 (Tenn.1993), a case with facts remarkably similar to those at issue here, the Tennessee Supreme Court invalidated the Tennessee grandparent-visitation act because it was inconsistent with Tennessee’s constitutional right to family privacy. In Hawk, the parents of two minor children enjoyed an intertwined familial and financial relationship with the grandparents of the children. However, a rift developed between the grandfather and the mother, which eventually resulted in the grandfather’s terminating the employment of the father and a subsequent disintegration of the relationship between the adults. The dispute between the adults did not immediately affect the relationship between the grandparents and the children, which had been a strong and beneficial one, but it eventually led to the parents’ restricting the grandparents’ visitation and ultimately ending it altogether. 855 S.W.2d at 575-76. The grandparents petitioned for grandparent visitation, which the trial court granted, reasoning that the parents’ “objections to visitation [were] rooted in a family conflict that the court believed should not interfere with the children’s relationship with their grandparents.” 855 S.W.2d at 577.
On appeal, the Tennessee Supreme Court stated:
“Although courts are commonly called on to resolve custody disputes between parents and to determine custody when parents are unfit, the trial court’s interference with the united decision of admittedly good parents represents a virtually unprecedented intrusion into a *627 protected sphere of family life. Because the statute, [Tenn.Code Ann.] § 36-6-301 (1985), suggests that this level of interference is permissible, we examine the constitutionality of the statute as it applies to married parents whose fitness as parents is unchallenged.”
855 S.W.2d at 577. The grandparents in Hawk argued, as do the paternal grandparents in this case, that the state has a compelling interest, pursuant to its parens patriae power, to protect the best interests of children by preserving the beneficial relationship between children and their grandparents. 855 S.W.2d at 579. The Hawk court disagreed, however, stating: “[W]ithout a substantial danger of harm to the child, a court may not constitutionally impose its own subjective notions of the ‘best interests of the child’ when an intact, nuclear family with fit, married parents is involved.” Id. In addition to relying on Tennessee precedent recognizing that the state has a compelling interest in protecting its children from harm, the Tennessee Supreme Court also noted that a line of United States Supreme Court cases also support the conclusion that
“the state’s power to interfere in the parent-child relationship is subject to a finding of harm to the child. In [Wisconsin v.] Yoder, [406 U.S. 205 (1972) ], for example, the United States Supreme Court deemed significant the fact that Amish children would not be harmed by receiving an Amish education rather than a public education. Yoder, 406 U.S. at 230, 92 S.Ct. at 1540. Likewise, in Pierce [v. Society of Sisters, 268 U.S. 510 (1925) ], the Court found that parents’ decisions to send their children to private schools were ‘not inherently harmful,’ as there was ‘nothing in the ... records to indicate that [the private schools] have failed to discharge their obligations to patrons, students, or the state.’ Pierce, 268 U.S. at 534, 45 S.Ct. at 573. In Meyer [v. Nebraska, 262 U.S. 390 (1923) ], a case in which a teacher had been convicted of teaching a child German, the Court found that ‘proficiency in a foreign language ... is not injurious to the health, morals or understanding of the ordinary child,’ and thus the state’s desire ‘to foster a homogeneous people with American ideals’ was insufficient justification for forbidding foreign language instruction. 262 U.S. at 402-3, 43 S.Ct. at 628. In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court required an individualized finding of parental neglect before stripping an unwed father of his parental rights. On the other hand, the Court upheld the conviction of a parent who allowed her child to sell religious magazines, approving state interference designed to prevent ‘psychological or physical injury’ to the child. See Prince v. Massachusetts, 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944). Federal cases, therefore, clearly require that some harm threaten a child’s welfare before the state may constitutionally interfere with a parent’s right to rear his or her child.
[[Image here]]
“We, too, agree that neither the legislature nor a court may properly intervene in parenting decisions absent significant harm to the child from those decisions. In so holding, we approve the logic of Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), which applied a two-step process to child neglect cases leading to foster family placement. In Santosky, the Supreme Court approved New York’s bifurcated proceeding requiring the state first to establish parental unfitness before placing a child in foster care. This procedure assures parents that a ‘best interests of the child’ analysis will not *628 pit them against potential foster parents; rather, the state cannot consider a child’s ‘best interests’ until the natural parents have been declared unfit. Id. at 759-61, 102 S.Ct. at 1397-98. An approach requiring a court to make an initial finding of harm to the child before evaluating the ‘best interests of the child’ works equally well in this case to prevent judicial second-guessing of parental decisions.... ”
855 S.W.2d at 580-81.
Based on the foregoing reasoning, the Tennessee Supreme Court reversed the judgment of the trial court granting the grandparents visitation. 855 S.W.2d at 582. The court held that the trial court had impermissibly stripped the parents of their right to control in parenting decisions by overruling their decision to deny the grandparents visitation without finding the parents unfit or dissolving their marriage and based solely on the trial court’s notion of the best interests of the children. Id. The court held that, without a showing that a parental decision substantially harms the child, the state has no compelling justification for interfering with the fundamental right of the parent to the custody and control of the child. Id.
Recognizing that we are not bound by the plurality opinions in Dodd I, Dodd II, and L.B.S., we hereby adopt the reasoning of Hawk and the majority of cases from other jurisdictions by holding that a grandparent seeking visitation with a child over the objection of a fit, natural, custodial parent, as an initial matter, must prove by clear and convincing evidence that the denial of the requested visitation would harm the child.
In following Hawk and similar decisions, we do not intend to minimize the relationship between grandparents and grandchildren or the valuable contributions that that relationship may make to the development of the grandchild, to which the dissent refers. 73 So.3d at 632. As stated in R.S.C., supra:
“If a grandparent is physically, mentally, and morally fit, then a grandchild ordinarily will benefit from a relationship with that grandparent. That grandparents and grandchildren normally can be expected to have a special bond cannot be denied. Each can benefit from contact with the other. Among other things, the child can learn lessons of love, respect, responsibility, and family and community heritage.”
812 So.2d at 365. However, we must acknowledge that the statutory right of a grandparent to visit with children over the objection of a fit, natural, custodial parent is only of a recent origin, appearing for the first time in this state in 1980. See Weathers v. Compton, 723 So.2d 1284, 1286 (Ala.Civ.App.1998). That right hardly stands as an enduring tradition of Western civilization on equal footing with the parental right to the custody and control of children. See J.S. v. D.W., 835 So.2d 174, 184 (Ala.Civ.App.2001), rev’d on other grounds, Ex parte D.W., 835 So.2d 186 (Ala.2002), on remand, 835 So.2d 191 (Ala.Civ.App.2002).[2] Consequently, although the state *629 may have a legitimate interest in fostering the grandparent-grandchild relationship, R.S.C., 812 So.2d at 365, the state may not do so in a manner that unduly infringes on fundamental parental rights. To prevent just such overreaching, we hold that the state may overrule the objection of a fit, natural, custodial parent to grandparent visitation only in order to prevent harm to the child.
In so ruling, we do not, as the dissent suggests, 73 So.3d at 630-33, declare the Act to be facially unconstitutional. As presently drafted, the Act requires a trial court in a grandparent-visitation case to consider “[ojther relevant factors in the particular circumstances....” Ala. Code 1975, § 30-3-4.1 (d)(6). Since we hold that a showing of harm to the child resulting from the denial of visitation is a prerequisite to any award of visitation under the Act, we conclude that subsection (d)(6) necessarily encompasses that showing as a “relevant factor” and that the Act is, therefore, facially valid. See L.B.S., 826 So.2d at 185 (holding that the judiciary could adopt a construction of a statute that would uphold its constitutionality). We emphasize, however, that the showing of harm is not to be weighed along with the other factors in § 30 — 3—4.1(d)(6). Rather, consistent with L.B.S. and J.W.J., a court considering a petition for grandparent visitation must first presume the correctness of the decision of a fit, natural, custodial parent as to grandparent visitation and then determine whether the petitioning grandparent has presented clear and convincing evidence that the denial of the requested visitation will harm the child. If so, the court may then weigh the other statutory factors to determine the mode and extent of grandparent visitation necessary to alleviate the harm to the child without further infringing on the fundamental rights of the parents. See L.B.S. v. L.M.S., 826 So.2d at 192 (Murdock, J., concurring in the judgment of reversal only) (noting that due process requires “that the court may order only visitation narrowly tailored to address an adjudged harm”).
In this case, in which the paternal grandparents do not dispute that the parents are the fit, natural, custodial parents of the children, the trial court erred in holding that, in order to overcome the presumption in favor of the parents’ denial of grandparent visitation, the paternal grandparents had to prove by clear and convincing evidence only that such visitation served the children’s best interests. We agree with the parents that the trial court erroneously failed to require the paternal grandparents to prove that the denial of visitation would cause the children harm. Although the trial court indicated that the parents’ decision to deny the paternal grandparents visitation had alienated the children from the paternal grandparents, their extended paternal family, and friends within the paternal grandparents’ circle, and had contributed to the destruction of the relationship between the parents and the paternal grandparents, the trial court did not make any finding that those consequences had detrimentally affected the children. In fact, the trial court concluded that, after three years without contact with the paternal grandparents and their associates, the children *630 were normal, well-adjusted, intelligent young ladies. The evidence in the record further shows that the children have performed well academically, socially, and athletically.
As pointed out by the dissent, 73 So.3d at 633, the trial court found that the children may later resent the control exerted by the parents and, without the adult advice of the paternal grandparents, may rebel against the parents. We need not decide whether resentment of the parents for denying the paternal grandparents visitation constitutes harm of the nature that would justify an award of grandparent visitation, because we conclude that the trial court did not have any evidence before it to support its findings. The record contains ample evidence indicating that the children are fully aware of the decision their parents have made to deny the paternal grandparents visitation. The record contains no evidence indicating that the children harbor any resentment or disrespect toward the parents based on that decision. The record likewise contains no evidence indicating that the children exhibit any tendencies to rebel against the parents and to break loose from their control based on their decision. It appears the trial court merely speculated as to the worst possible consequence of the denial of visitation.
The trial court did find that the continued alienation between the parents and the paternal grandparents posed the greatest threat to the emotional development of the children. However, the key inquiry in cases of this nature is whether the emotional development of the children would be threatened by the continued alienation between the paternal grandparents and the children. If so, grandparent visitation can ameliorate that damage. As the circumstances of this case show, however, forced grandparent visitation should not be used as a means for ending family disharmony. The record indicates that the parents became even more alienated from the paternal grandparents following the one court-ordered visitation in June 2008 than they had been before.
Because the trial court awarded visitation to the paternal grandparents without the requisite showing of harm, the trial court unconstitutionally applied the Act to the parents. Therefore, we reverse the judgment of the trial court and render a judgment for the parents denying the petition of the paternal grandparents.
REVERSED AND JUDGMENT RENDERED.
BRYAN, THOMAS, and MOORE, JJ., concur.
THOMPSON, P.J., concurs in the result, with writing.
PITTMAN, J., dissents, with writing.

. In Ex parte D.W., 835 So.2d 186 (Ala.2002), the supreme court held that Ala.Code 1975, § 26-10A-30, which grants to probate courts the discretion, based on the best interests of the child, to grant or maintain visitation rights of the natural grandparents of an adop-tee child, does not unconstitutionally infringe on the rights of adoptive parents. The court reasoned that adoptive parents, unlike natural parents, acquire only such custodial rights as are granted by statute. Hence, the legislature may validly qualify those custodial rights, and withhold from adoptive parents the right enjoyed by natural parents to deny grandparent visitation, without offending due process. The holding in D.W. applies solely to adoptive parents and does not address the extent of the power of the state to interfere with the grandparent-visitation decisions of natural parents. Hence, we refer in this case to the fundamental rights of natural parents.

. In Moore v. City of East Cleveland, Ohio, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), the Supreme Court held that American citizens enjoy freedom of personal choice in matters of family life. That freedom entails the right to form extended families, with grandparents acting in loco parentis, particularly following the death or absence of a child’s parents. In such cases, in which a grandparent has assumed and exercised the custodial role of the parent to the exclusion of the parent, the state may not unduly impinge on the fundamental right of grandparents to the familial relation with their grandchildren. Although Moore supports the proposition that the state may not impair the relationship be *629 tween a custodial grandparent and a grandchild absent a compelling governmental interest, it does not suggest that a state may raise the interest of noncustodial grandparents above that of fit, natural, custodial parents. In a contest between a fit, natural, custodial parent with traditional fundamental natural rights to control a child and a noncustodial grandparent seeking to enforce modern state-conferred rights of visitation, the former prevails as a matter of constitutional law.