PER CURIAM.
G.H. (“the mother”), the mother of E.B. and C.B. (“the children”), two minor children made the subject of proceedings brought by the Cleburne County Department of Human Resources (“DHR”) in the Cleburne Juvenile Court, appeals from two judgments of that court determining the children to be dependent and awarding custody of the children to their father, J.R.B. (“the father”).
In November 2009, DHR filed petitions in the juvenile court alleging, in pertinent part, that the children were dependent because, DHR averred, the mother and her current husband were using the illicit drug methamphetamine and were caring for the children under the influence of that drug; it was also averred that domestic violence had occurred in the mother’s home in the presence of the children. Pursuant to a shelter-care order, pendente lite custody of the children was placed with DHR pending a trial on the petitions. After a trial, the juvenile court entered two judgments declaring the children to be dependent and awarding custody of the children to the father, a Georgia resident who had appeared in the actions and requested custody. The mother’s post-judgment motions were automatically denied by operation of Rule 1(B), Ala. R. Juv. P., prompting her appeals (which were consolidated by this court ex mero motu); because the juvenile-court judge certified the record as adequate for appellate review, we have appellate jurisdiction pursuant to Rule 28(A)(1), Ala. R. Juv. P. The mother raises four issues: she contends that the juvenile court’s judgments are void for lack of subject-matter jurisdiction, that the judgments are not supported by the evidence, that the disposition was not in the best interests of the children, and that the mother’s visitation was impermis-sibly made subject to the father’s discretion.
Many of the legal principles governing our examination of the juvenile court’s judgments were summarized in J.W. v. C.H., 963 So.2d 114 (Ala.Civ.App.2007), including the standard of review applicable to the bulk of the issues presented:
*542 “ ‘In matters concerning child custody and dependency, the trial court’s judgment is presumed correct on appeal and will not be reversed unless plainly and palpably wrong.’ Ex parte T.L.L., 597 So.2d 1863, 1364 (Ala.Civ.App.1992); see also Ex parte R.E.C., 899 So.2d 272, 279 (Ala.2004). Additionally, in Ex parte Anonymous, 803 So.2d 542 (Ala.2001), the Alabama Supreme Court stated:
“ ‘The ore tenus rule provides that a trial court’s findings of fact based on oral testimony “have the effect of a jury’s verdict,” and that “[a] judgment, grounded on such findings, is accorded, on appeal, a presumption of correctness which will not be disturbed unless plainly erroneous or manifestly unjust.” Noland Co. v. Southern Dev. Co., 445 So.2d 266, 268 (Ala.1984). “The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.” Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986).’
“803 So.2d at 546.
[[Image here]]
“... [BJecause the juvenile court received ore tenus evidence and observed the witnesses’ demeanors, this court cannot reverse the juvenile court’s judgment unless it is unsupported by the evidence so as to be clearly and palpably wrong. Everett v. Everett, 660 So.2d 599, 602 (Ala.Civ.App.1995).”
963 So.2d at 119-20. Of course, the mother’s subject-matter-jurisdiction contention invokes de novo review. See A.C. v. C.C., 49 So.3d 726, 731 (Ala.Civ.App.2010).
The record reveals that DHR received a child-abuse-and-neglect report on August 4, 2009, as to the children to the effect that the mother and her husband were using methamphetamine.[1] During DHR’s subsequent investigation, the mother admitted that both she and her husband were currently using methamphetamine, that she believed that her husband was manufacturing methamphetamine, and that she had purchased cold medicines for her husband to use in manufacturing the drug; further, she stated that her husband was no longer welcome in the family home and that she had had to use chairs to brace doors in an effort to block his regular efforts at breaking and entering the home — efforts made in the presence of the children. The children were then placed under an out-of-home safety plan pursuant to which a maternal aunt would care for the children. The father, who had received visitation pursuant to a judgment divorcing him from the mother, continued to exercise visitation with the children under DHR’s safety plan; he sought custody of the children once DHR had filed its petitions.
DHR recommended that the mother complete a drug assessment, which she did, and she began attending weekly support-group meetings; subsequently, she completed a 28-day inpatient drug-treatment program as well. However, the mother did not initiate divorce or protection-from-abuse proceedings as to her husband, nor did she report him to police or prosecuting authorities for any criminal activity;[2] further, DHR’s investigator ob *543 served at trial that the mother had no income or job, and she and DHR’s caseworker currently assigned to the case both opined that the mother had not, as of December 2009, received services for a sufficient period so as to warrant return of the children to her home in light of her methamphetamine-use history (which, the mother admitted at trial, had resumed in June 2008, soon after the deaths of her grandmother and mother). It was further revealed at trial that the mother, at the time of trial, was the subject of pending felony charges to the effect that she had conspired to manufacture methamphetamine by buying over-the-counter cold medicines. The mother’s principal drug-treatment counselor, while praising the mother’s progress in that treatment and opining that DHR’s continued physical custody of the children was unnecessary, testified that the mother’s remaining drug-free during a span of 18 months would make a significant difference in the likelihood that the mother would not relapse into methamphetamine use and that the mother had not been “clean” for a “substantial amount of time” as of trial.
The father testified at trial that he lived in a four-bedroom, two-bathroom residence in Haddock, Georgia, with his new wife and their two-and-a-half-year-old daughter and that he was purchasing the residence while working for a natural-gas piping contractor, a job he had held during the preceding 3 calendar years in a field where he had worked for the preceding 15 years. The father testified that he and the mother had divorced approximately four years earlier and that since that time he had regularly exercised monthly weekend visitation with the children and two weeks’ worth of visitation during summers, either as scheduled or on a “make-up” basis. The father also offered, and the juvenile court accepted into evidence, photographs of his residence depicting the children’s current sleeping quarters during their visitation periods with the father in Georgia. At the conclusion of testimony, the father agreed that if the children were placed in his home, he would allow the children to visit with the mother’s other child, M.C., their half sister, who was apparently destined to remain in foster care in the home of the father’s brother and sister-in-law.[3]
The father admitted to having used illegal drugs in the past, but he testified that he ceased his usage in 2004 when he entered a four-month in-house drug-rehabilitation program in Albany, Georgia, that he subsequently completed. Although the father admitted on cross-examination that a test of his urine on a previous hearing date had been deemed invalid because of his having excreted an insufficient amount of discolored urine, results of a blood test administered that same day and admitted on redirect examination showed the father not to have ingested drugs. In addition, at trial, the mother’s counselor answered in the affirmative a hypothetical question posed by counsel for the father concerning whether, if someone were “off drugs” for approximately five years, had held a long-term job, had cared for a two-and-a-half-year-old child in his home with no problems, and was financially supporting children outside his home and visiting with them regularly, that person could properly be deemed “stable and successful in [his] sustained rehabilitation” and in “sustained recovery.”
At the close of the trial, the juvenile-court judge remarked that the mother’s home “continue[d] to cause [him] a lot of *544 concern.” Although the judge “applaud[ed] [the mother] for all [she had] accomplished,” he observed that, in his experience, “for anybody to stay straight is really a lot when it comes to meth.” In the juvenile-court judge’s view, the mother’s progress had been “short term,” and he “want[ed] to see a longer pattern established” before allowing the children to return to the mother’s home.
We first consider whether the juvenile court properly exercised subject-matter jurisdiction as to the dependency petitions, a question that also involves the correctness of the dependency determinations contained therein. The pleadings commencing the dependency cases involving the children were not filed by the father or another family member; rather, they were filed by DHR acting as parens patriae, and they were endorsed by the juvenile-court intake officer, pursuant to § 12 — 15—120(b), Ala.Code 1975, as being within the subject-matter jurisdiction of the court and as amounting to filings in the best interests of the public and the children. Further, the juvenile court in this case found the children dependent. This case is thus not parallel to cases such as E.H. v. N.L., 992 So.2d 740 (Ala.Civ.App. 2008), cited by the mother, or K.C.G. v. S.J.R., 46 So.3d 499 (Ala.Civ.App.2010), in which a child’s relative asserts a child’s dependency in an initial pleading but, at trial, fails to prove the child’s dependency. Finally, to the extent that the mother seeks to contend that the dependency determinations are not supported by the evidence, we conclude from the foregoing facts of record that (a) the mother has a recurring addiction to methamphetamine that has lasted for the preceding decade; (b) the mother had managed to remain drug-free for only a few weeks before trial after completing a drug-treatment program; (c) the mother is facing felony drug charges; and (d) DHR representatives do not believe that the mother is yet able to resume custody of the children. From that evidence, and in light of Ala.Code 1975, § 12-15-102(8)a.6., which includes within the definition of a “dependent child” a child “[w]hose parent ... is unable or unwilling to discharge his or her responsibilities to and for the child” (emphasis added), the juvenile court could properly conclude, as it did, that the children were dependent notwithstanding the mother’s protestations of fitness.
The special writing concurring in the result to affirm suggests that the Alabama Supreme Court, in deciding Ex parte L.E.O., 61 So.3d 1042 (Ala.2010), has ruled in a manner consistent with the juvenile court’s judgment in this case, but posits that the supreme court has erred in so ruling and that that court should overrule that opinion. However, the proposition accepted by a majority of the supreme court in Ex parte L.E.O. — that a child with a fit noncustodial parent willing to assume custody can properly be declared dependent— is consistent with both J.J. v. J.H.W., 27 So.3d 519 (Ala.Civ.App.2008), and Floyd v. Alabama Department of Human Resources, 550 So.2d 980 (Ala.Civ.App.1988), aff'd, 550 So.2d 982 (Ala.1989), in which this court (and, in Floyd, the Alabama Supreme Court as well) affirmed judgments determining children to be dependent and awarding physical custody of those children to their fathers.
The mother also contends that the juvenile court erred in its custody disposition. Contrary to the mother’s intimations regarding the prevailing standard in modification-of-custody proceedings involving parents, under Ala.Code 1975, § 12-15-314(a)(3)c. and (a)(4), a juvenile court is empowered, in disposing of the custody of a dependent child, to “[t]ransfer legal custody to ... [a] relative” or to “[m]ake any *545 ... order as the juvenile court in its discretion shall deem to be for the welfare and best interests of the child.” In this case, there was ample evidence adduced to the effect that (a) the father had remained drug-free for the preceding five years before trial, (b) the father had maintained a steady job and had acquired a suitable home to provide for the material needs of the children, (c) the father had visited with the children regularly since the mother and the father had divorced five years previously, and (d) the father was willing to accept custody of the children and to allow them to visit with their half sister (who apparently remains in foster care). Although the mother argues that the father has a “history” of domestic violence and has not received counseling as to that issue, the record shows no indication that that violence was directed at the children, and the father testified that there had been mutual acts of violence between the father and the mother during their marriage. The juvenile court could properly have concluded, as it did, that custody of the children should be awarded to “a willing, fit, and able relative” such as the father. Ala.Code 1975, § 12-15-314(a)(3)c.
Finally, we note the mother’s contention that her visitation rights have been improperly limited. The juvenile court, in its judgment, stated that the mother would have “visitation set under such terms and conditions as available through her juvenile case involving [M.C.,] her other minor child who is not the child of [the father],” and directed the father “to cooperate with the implementation of said visitation.” The court further noted its “intent ... to provide such precautions and protections as are necessary to provide for the safety of the [children] but to also allow the visitation to expand as the mother’s progress with services continues.”
Although the mother contends that that provision mandates that the mother’s visitation rights with the children are “to be determined by the [individualized-service-plan] team,” the record does not contain a copy of any of the pleadings, orders, or judgments in the “juvenile case involving” M.C. by which we may assess whether the mother’s visitation is imper-missibly constrained by the whims of an individualized-service-plan team, the whims of the father, or both. The mother, as the appellant, has the burden of ensuring that the record contains sufficient evidence to warrant reversal, see Kimbrough v. Kimbrough, 963 So.2d 662, 665 (Ala.Civ. App.2007), and we cannot properly predicate error based upon allegedly improper provisions of a judgment we cannot find in the record. Even were the judgment pertaining to M.C. present in the record, and even were that judgment to provide for visitation as permitted by a third-party entity, such as an individualized-service-plan team constituted under administrative authority and including the mother herself, see Ala. Admin. Code (DHR), Rule 660-5-47-.04(3)(a), we would venture far afield of our holdings in K.B. v. Cleburne County Department of Human Resources, 897 So.2d 379 (Ala.Civ.App.2004), and other cases proscribing custodians from exercising absolute veto powers over visitation if we were to hold, as the mother would have us hold, that the juvenile court did not have the discretion in this case to allow gradual expansion of the mother’s visitation upon a showing of her continued demonstrated progress toward sobriety.
Based upon the foregoing facts and authorities, the judgments of the juvenile court are due to be affirmed.
2090431 — -AFFIRMED.
2090432 — AFFIRMED.
*546 THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
BRYAN, J., concurs in the result, without writing.
MOORE, J., concurs in the result, with writing.

. DHR’s records indicate that the mother has been involved with methamphetamine use since 2004, whereas the mother, who was 32 years old at the time of trial, testified to having used methamphetamine since she was "[pjrobably 19 or 20.”

. The mother's husband was, however, ultimately charged with having committed drug offenses, and the mother testified that she planned to seek a divorce from him because "[h]e’s looking at years in prison."

. The appellate record contains no indication as to any permanent custodial disposition of M.C.