MURDOCK, Justice
(concurring specially).
I believe this is the most important case the members of this Court have ever been asked to decide. The nuclear family is the *659 building block for Western society. How we decide this case has the farthest reaching of ramifications for the integrity of the nuclear family and the parent-child relationship that is at its core.
Any case concerning the custody of a child is among the most important this or any court can ever be called upon to consider. Here, the custody issue concerns grandparent visitation. As important as this issue is in its own right, the manner in which we choose to analyze it — especially if we were to analyze it in a manner consistent with the statute at issue — will have ramifications far beyond the issue of grandparent visitation. Ultimately, this case pits the integrity of the nuclear family and the parent-child relationship against the power of the government to intrude upon the nuclear family, to override fit custodial parents’ choices for their children, and to take on the role of a “village” that decides how our children should be raised.
I.
I am a grandparent.
I also note that, as a child, I was blessed to know the love of three grandparents, one of whom in particular was like a second mother to me during early parts of my life and remained a vital influence on me throughout my childhood.
It is with a deep appreciation for the love and special bonds that can and should exist between grandparents and their grandchildren that I, like the other members of this Court today, affirm the vital role that grandparents do — and should— play in the lives of their grandchildren, and vice versa. See R.S.C. v. J.B.C, 812 So.2d 361, 365 (Ala.Civ.App.2001) (plurality opinion I authored as a judge on the Alabama Court of Civil Appeals).
The question whether grandparents should have a “right” to visit with their grandchildren, however, is often assumed by the casual observer to be something different than it is. Upon initially being confronted with the issue, many (including myself some 10 years ago as a judge on the Court of Civil Appeals) are tempted to respond reflexively and affirmatively based on thoughts of the kind, loving grandparents we were blessed to have in our lives as children (or are attempting to be as adults) and on relatively brief visits at grandmother’s house, often with parents present. Ultimately, however, the question presented is whether the government has the power to mandate, through the use of force if necessary, the physical removal of children from fit custodial parents and to do so under circumstances that could be much different than those described above.
Parents might decide that their infant son should not spend unsupervised time with his grandmother because of a concern about the grandmother’s driving ability or her inability to manage stairs in her home. Parents might limit the visitation of their daughter with a grandfather to brief periods when one of the parents can be present because of concerns that the grandfather suffers from dementia or some mental illness he fails or refuses to recognize, because of suspected child-abuse tendencies, or because his manner of interaction with the children is less than kind. Sometimes there is objective evidence of such matters, evidence that would be competent in a courtroom. Sometimes there is not. Sometimes there is only a reasonable suspicion or a mother’s intuition.
Moreover, at issue here is not just Sunday afternoon visits for a few hours at grandmother’s house. The power to order visitation includes the power to physically remove children from their parents and place them in a temporary custodial rela *660 tionship with another adult for days or even weeks at a time. What is at issue here is the ability of the government, over the objection or even fears of loving and caring parents, and over any objection or fears of the child himself or herself, to mandate that the child be physically removed from the presence of his or her parents and placed unsupervised with another adult, merely because the government decides “it is better this way.”
Unless a parent has been deemed unfit or has voluntarily forfeited custody of his or her child, the law rightly assumes that the parent wants what is best for the child and that, if the parent restricts the child’s relationship with some person, even a grandparent, the parent has a valid reason for doing so and need not defend that reason to the government.[15] Admittedly, we live in a fallen world. All is not perfect. The parent may well get it wrong. Then again, parents do that all the time. But if parents can get it wrong, how much more so the government? As between fit parents and the government, I must choose the parents. If we allow the government the power to decide what is in a child’s “best interest” and to enforce that decision over the objection of such parents, we have allowed the government to assume a frightening power.[16]
I absolutely do not see how this or any court can hold constitutional a statute that, like the one before us, empowers the government to mandate, and achieve by force if necessary, the physical removal of a child from his or her fit custodial mother and father and the physical placement of that child, even temporarily, with some other person, over the objections of that child’s parents merely because the government differs with the parents as to what would be in the child’s best interests. To empower the government in this manner would be to make the government into the “over parent” of every child in its jurisdiction and to deprive the child’s mother and father of their God-given role.
II.
The United States Supreme Court has held that the Due Process Clause of the United States Constitution
“guarantees more than fair process, and the ‘liberty’ it protects includes more than the absence of physical restraint. The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests. Reno v. Flores, 507 U.S. 292, 301-302 (1993); [Planned Parenthood of Southeastern Pa. v.] Casey, 505 U.S. [833,] 851 [ (1992) ]. In a long line of cases, we have held that, in *661 addition to the specific freedoms protected by the Bill of Rights, the ‘liberty’ specially protected by the Due Process Clause includes the rights ... to have children, Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535 (1942), [and] to direct the education and upbringing of one’s children, Meyer v. Nebraska, 262 U.S. 390 (1923); Pierce v. Society of Sisters, 268 U.S. 510 (1925)....
[[Image here]]
“... [W]e have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, ‘deeply rooted in this Nation’s history and tradition,’ [Moore v. East Cleveland, 431 U.S. 494,] 503 [ (1977) ] (plurality opinion); Snyder v. Massachusetts, 291 U.S. 97, 105 (1934) (‘so rooted in the traditions and conscience of our people as to be ranked as fundamental’), and ‘implicit in the concept of ordered liberty,’ such that ‘neither liberty nor justice would exist if they were sacrificed,’ Palko v. Connecticut, 302 U.S. 319, 325, 326 (1937).... Our Nation’s history, legal traditions, and practices thus provide the crucial ‘guideposts for responsible decision making,’ Collins [v. Harker Heights, 503 U.S. 115,] 125 [(1992)], that direct and restrain our exposition of the Due Process Clause. As we stated recently in Flores, the Fourteenth Amendment forbids the government to infringe ... “fundamental” liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest. ’ 507 U.S., at 302.”
Washington v. Glucksberg, 521 U.S. 702, 719-20, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (some citations and some emphasis omitted; emphasis added); see also Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 842, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (“There does exist a ‘private realm of family life which the state cannot enter,’ that has been afforded both substantive and procedural protection.” (quoting Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (footnotes omitted))). As the Supreme Court explained in Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the liberty guaranteed by the Fourteenth Amendment “denotes not merely freedom from bodily restraint but also the right of the individual ... to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.”
Although the United States Supreme Court’s decision in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), is generally referred to as a plurality decision, a majority of the Justices recognized that the State’s attempt to impose grandparent visitation over the objection of the parent in that case implicated the fundamental right of the parent. 530 U.S. at 95 (Kennedy, J., dissenting) (“[T]here is a beginning point that commands general, perhaps unanimous, agreement in our separate opinions: As our case law has developed, the custodial parent has a constitutional right to determine, without undue interference by the state, how best to raise, nurture, and educate the child. The parental right stems from the liberty protected by the Due Process Clause of the Fourteenth Amendment.”).[17]
*662 It cannot be disputed that § 30-3-4.1, Ala.Code 1975, infringes on the ability of parents to make decisions as to the care, custody, and control of their children. Thus, as the main opinion reflects, a so-called “strict-scrutiny” analysis applies. The State must show a compelling state interest and must also show that § 30-3-4.1 and any remedy flowing therefrom are narrowly tailored to address that compelling state interest. See Glucksberg, supra; see also Troxel, 530 U.S. at 80 (Thomas, J., concurring in the judgment). Section 30-3-4.1 fails as to both elements.
The dissent correctly notes that Troxel did not hold that a showing of “harm” was a necessary component of a statute authorizing courts to order grandparent visitation. We must keep in mind two things, however. First, as the Troxel plurality made clear, the Troxel Court simply did not find it necessary to reach this issue in the case before it. Second, what that Court clearly did reach, and what it clearly expressed, was that a showing merely of “best interests” is not enough. Yet, if we uphold the Alabama statute before us, that is exactly what this Court will be saying is enough. See Ala.Code 1975, § 30-3^4.1 (“[T]he court shall determine if visitation by the grandparent is in the best interests of the child.”).
Statements in Troxel that make it clear that the State cannot override a fit parent’s decision based merely on a “best-interest” standard begin with the Court’s recognition of the absolutely critical nature of parents’ rights in relation to their children:
“The Fourteenth Amendment provides that no State shall ‘deprive any person of life, liberty, or property, without due process of law.’ We have long recognized that the Amendment’s Due Process Clause, like its Fifth Amendment counterpart, ‘guarantees more than fair process.’ Washington v. Glucksberg, 521 U.S. 702, 719 (1997). The Clause also includes a substantive component that ‘provides heightened protection against government interference with certain fundamental rights and liberty interests.’ Id., at 720; see also Reno v. Flores, 507 U.S. 292, 301-302 (1993).
“The liberty interest at issue in this case — the interest of parents in the care, custody, and, control of their children— is perhaps the oldest of the fundamental libeHy interests recognized, by this Court. More than 75 years ago, in Meyer v. Nebraska, 262 U.S. 390, 399, 401 (1923), we held that the ‘liberty’ protected by the Due Process Clause includes the right of parents to ‘establish a home and bring up children ’ and ‘to control the education of their own.’ Two years later, in Pierce v. Society of Sisters, 268 U.S. 510, 534-535 (1925), we again held that the ‘liberty of parents and guardians’ includes the right ‘to direct the upbringing and education of children under their control.’ We explained in Pierce that ‘[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.’ Id., at 535. We returned to the subject in Prince v. Massachusetts, 321 U.S. 158 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. ‘It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.’ Id., at 166.
*663 “In subsequent cases also, we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. See, e.g., Stanley v. Illinois, 405 U.S. 645, 651 (1972) (‘It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children “come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements” ’ (citation omitted)); Wisconsin v. Yoder, 406 U.S. 205, 232 (1972) (‘The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition ’); Quilloin v. Walcott, 434 U.S. 246, 255 (1978) (‘We have recognized on numerous occasions that the relationship between parent and, child is constitutionally protected, ’); Parham v. J.R., 442 U.S. 584, 602 (1979) (‘Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course’); Santosky v. Kramer, 455 U.S. 745, 753 (1982) (discussing ‘[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child’); Glucksberg, supra, at 720 (‘In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the “liberty” specially protected by the Due Process Clause includes the righ[t] ... to direct the education and upbringing of one’s children’ (citing Meyer and Pierce)). In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.”
530 U.S. at 65-66 (emphasis added). The Troxel Court then makes clear that the government cannot override a fit parent’s choices for his or her children merely because the government thinks it can make a “better decision’’ than the parent as to what is in the child’s “best interests’’:
“Section 26.10.160(3), as applied to Granville and her family in this case, unconstitutionally infringes on that fundamental parental right. The Washington nonparental visitation statute is breathtakingly broad. According to the statute’s text, ‘[a]ny person may petition the court for visitation rights at any time,’ and the court may grant such visitation rights whenever ‘visitation may serve the best interest of the child.’ § 26.10.160(3) (emphases added [in Troxel ]). That language effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent’s children to state-court review. Once the visitation petition has been filed in court and the matter is placed before a judge, a parent’s decision that visitation would not be in the child’s best interest is accorded no deference. Section 26.10.160(3) contains no requirement that a court accord the parent’s decision any presumption of validity or any weight whatsoever. Instead, the Washington statute places the best-interest determination solely in the hands of the judge. Should the judge disagree with the parent’s estimation of the child’s best interests, the judge’s view necessarily prevails. Thus, in practical effect, in the State of Washington a court can disregard and, overturn any decision by *664 a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge’s determination of the child’s best interests. The Washington Supreme Court had the opportunity to give § 26.10.160(3) a narrower reading, but it declined to do so. See, e.g., 137 Wash.2d at 5, 969 P.2d, at 23 (‘[The statute] allow[s] any person, at any time, to petition for visitation without regard to relationship to the child, without regard to changed circumstances, and without regard to harm’); id., at 20, 969 P.2d, at 30 (‘[The statute] allow[s] “any person” to petition for forced visitation of a child at “any time” with the only requirement being that the visitation serve the best interest of the child’).
[[Image here]]
“... Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent’s children. See, e.g., [Reno v.] Flores, 507 U.S. [292], at 304 [ (1993) ].
[[Image here]]
“... As we have explained, the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a ‘better’ decision could be made. Neither the Washington nonparental visitation statute generally — which places no limits on either the persons who may petition for visitation or the circumstances in which such a petition may be granted — nor the Superior Court in this specific case required anything more. Accordingly, we hold that § 26.10.160(3), as applied in this case, is unconstitutional.”
Troxel, 530 U.S. at 65-73 (some emphasis omitted; some emphasis added).
As Justice Thomas explained in his concurring opinion in Troxel:
“I agree with the plurality that this Court’s recognition of a fundamental right of parents to direct the upbringing of their children resolves this case. Our decision in Pierce v. Society of Sisters, 268 U.S. 510 (1925), holds that parents have a fundamental constitutional right to rear their children, including the right to determine who shall educate and socialize them. The opinions of the plurality, Justice KENNEDY, and Justice SOUTER recognize such a right, but curiously none of them articulates the appropriate standard of review. I would apply strict scrutiny to infringements of fundamental rights. Here, the State of Washington lacks even a legitimate governmental interest — to say nothing of a compelling one — in second-guessing a fit parent’s decision regarding visitation with third parties. On this basis, I would affirm the judgment below.”
Troxel, 530 U.S. at 80 (Thomas, J., concurring in the judgment) (emphasis added).
It is clear from these passages that the government is not free to override the choice of fit custodial parents as to their children’s associations merely because the government thinks it can reach a “better decision” than the children’s parents.
“ ‘Among those interests lying at the core of parents’ rights to raise and care for their own children is the right to control their children’s companions and associations.’ R.S.C. v. J.B.C., 812 So.2d 361, 368 (Ala.Civ.App.2001). As noted in J.S. v. D.W., 835 So.2d 174, 182 (Ala.Civ.App.2001), reversed on other *665 grounds, 835 So.2d 186 (Ala.2002), ‘[t]he common law recognized the right of parents to determine with whom their child would associate.’ See also M.L.B. v. S.L.J., 519 U.S. 102, 116 (1996) (‘[cfhoices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as “of basic importance in our society,” ... rights sheltered by the Fourteenth Amendment against the State’s unwarranted usurpation, disregard, or disrespect’); Hoff v. Berg, 595 N.W.2d 285 (N.D.1999) (holding North Dakota’s grandparent-visitation statute unconstitutional on the ground that it burdened the parents’ fundamental right to control their children’s associations).”
McQuinn v. McQuinn, 866 So.2d 570, 579 (Ala.Civ.App.2008) (Murdock, J., concurring in part, concurring in the result in part, and dissenting in part).
As Justice Thomas noted in Troxel, a “strict-scrutiny” analysis applies when a fundamental right is at issue and only a “compelling interest” of the state justifies governmental interference with such right. The notion that the state has a “compelling interest” that empowers it to decide the “best interests” of children is logically irreconcilable with the notion of a God-given and unalienable liberty interest, protected by the United States Constitution, in the right of parents to control the associations of their children.
Only the parent-child relationship holds a specially protected status under the Constitution. Once one moves beyond the child’s relationship with the parent, the Constitution provides no principled distinction between a child’s relationship with his or her grandparents, great-grandparents, cousins, older siblings, aunts and uncles, neighbors, etc. If we decide that the state can substitute its decision for that of a fit parent with respect to a child’s visitation with a grandparent merely because the state thinks it is in the best interests of the child for it to do so, then there is nothing that prevents the state from using the same “best interests” basis to substitute its judgment for that of a fit parent as to the issue of the child’s visitation with any other relative, or even a nonrelative. For that matter, if the state has a “compelling interest” in looking after the “best interests” of children, there would no longer be a constitutional basis on which to restrain government from substituting its judgment for that of a fit parent as to any issue, whether it be choice of schools, decisions as to medical care, whether to sign up the child for the soccer team or to enroll him or her in violin lessons, whether to allow the child to spend the night with friends, what is an appropriate bedtime, diet, etc. If the government can cross the line heretofore informed by the parents’ fundamental right to the care, custody, and control of their children, in what new location and on what principled basis could any different line ever be drawn?
As to the fact that the Troxel decision did not reach the issue of harm, the dissent takes the position that, absent a requirement from the United States Supreme Court that a grandparent visitation act must include a harm standard in order to be constitutional, “and in the face of existing precedent from this Court and from the Court of Civil Appeals ..., I see no need to declare the Act unconstitutional.” 73 So.3d at 684 (Main, J., dissenting). Respectfully, I disagree. There always is a need to declare a statute unconstitutional if this Court concludes that it is unconstitutional, if the issue is properly presented to us, and if we must reach that issue in order to decide the case. The United States Supreme Court in Troxel, as it does in many cases, had the luxury under the circumstances in that particular case of *666 going only “so far” in order to dispose of the immediate case before it. State courts such as ours, in cases such as this, often do not have that luxury; real decisions need to be made in real cases without the luxury of waiting on the United States Supreme Court to make its next pronouncement. The United States Supreme Court acknowledged as much when it stated that “much state-court adjudication in this context occurs on a case-by-case basis,” 530 U.S. at 73, citing as examples the Maryland case of Fairbanks v. McCarter, 330 Md. 39, 49-50, 622 A.2d 121, 126-27 (1993), and the Virginia case of Williams v. Williams, 256 Va. 19, 21, 501 S.E.2d 417, 418 (1998), and noting that the latter case “interpret[ed] Virginians] nonparental visitation statute to require a finding of harm as condition precedent to awarding visitation.”[18] 530 U.S. at 74.
Consistent with the need for state appellate courts to make decisions on constitutional matters without prior guidance from the United States Supreme Court, the Court of Civil Appeals was required in a number of eases during my tenure on that court to address the same fundamental issue that is presented to us today. In the lead opinion in R.S.C. v. J.B.C., 812 So.2d 361, 364-65 (Ala.Civ.App.2001), I expressed the view that, as a prerequisite to court-ordered, unsupervised grandparent visitation, there must be a showing that there would be “harm or potential harm to the child if such visitation is not allowed.” [19] 812 So.2d at 372. The following year I wrote specially in L.B.S. v. L.M.S., 826 So.2d 178 (Ala.Civ.App.2002) (Murdock, J., concurring in the judgment of reversal only; joined by Yates, P.J.), to express my view that grandparent visitation may be ordered only upon a threshold showing by “clear and convincing evidence” of “substantial harm to the child if the requested visitation is not granted.” 826 So.2d at 188. I further asserted that the interference permitted in such circumstances must be that which is “least restrictive of the fundamental right and most *667 closely tailored to serve [the] compelling state interest” in preventing the harm in question.[20] 826 So.2d at 192. The views I *668 expressed in R.S.C. and L.B.S. were further refined in Beck v. Beck, 865 So.2d 446 (Ala.Civ.App.2003) (Murdock, J., concurring in the result), in which I suggested as follows:
“[W]hile § 30-3-4.1 attempts to open the door for courts to impose grandparent visitation against the wishes of a fit parent, the United States Constitution requires that that door be all but closed — remaining only slightly ajar for those egregious cases where it is ‘clear’ that ‘substantial harm’ will come to the child absent judicial intervention.[2]
865 So.2d at 451.
Based upon my consideration of this question since my participation in the foregoing cases, including my consideration of the various statutes adopted by the legislature over the past 30 years in several unsuccessful attempts to address this issue in a manner consistent with constitutional dictates, I have come to the conclusion that the wiser and more prudent course — and, more importantly, the course dictated by the respect and protection required by our Constitution to the unalienable right of fit custodial parents to raise their children and control their associations — would be an approach consistent with the approach suggested by Judge Crawley in his concurring opinion in R.S.C. v. J.B.C., 812 So.2d 361, 373 (Ala.Civ.App.2001) (Crawley, J., concurring in the result):
“I agree with the discussion of the applicable legal principles. However, I conclude that Ala.Code 1975, § 30-3-4.1, is per se, or facially, unconstitutional. The opinion recognizes that a fit parent has a fundamental right ‘in the absence of harm or potential harm to the child’ to determine when a grandparent may visit his or her child and that § 30-3^4.1 is not narrowly tailored to protect that fundamental right. 812 So.2d at 372. I agree with that reasoning except for the phrase I quoted above — ‘in the absence of harm or potential harm to the child.’ Our state has a procedure for protecting children from harm — the invocation of dependency jurisdiction. See Ala.Code 1975, § 12-15-1 et seq., and § 26-18-1 et seq. See also my opinion concurring in the result in J.S. v. D.W., 835 So.2d 174 (Ala.Civ.App.2001)[, rev’d, Ex parte D.W., 835 So.2d 186 (Ala.2002) ].”
I refer to an approach “consistent with” the approach suggested in Judge Craw-ley’s special writing in R.S.C. because I would add to Judge Crawley’s explanation of the availability of “dependency jurisdiction” for the protection of children from harm the fact that the State also provides for that purpose the forfeiture and unfitness standards discussed in Ex parte Terry, 494 So.2d 628, 632 (Ala.1986), and its *669 progeny. As the Court explained in Terry:
“ ‘The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law. So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only by a finding, supported by competent evidence, that the parent seeking custody is guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.’ ”
Terry, 494 So.2d at 632 (quoting Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983)) (some emphasis omitted).[21]
I also offer the following comments in relation to various comments in the dissenting opinion:
First, at both its outset and near its conclusion, the dissenting opinion speaks of the necessity of the State’s acting when children are in need of “protection.” The term “protection” necessarily implies the existence of something from which the child needs to be protected, i.e., “harm.” I do not believe that this Court ever has recognized the power of the government to “protect” children from not being the recipients of the “best” decisions that could be made for them. If that is the law, I respectfully observe that there are not enough file folders, filing cabinets, courtrooms, judges, or hours in the day for the courts of this State to address the virtually infinite number of decisions made by fit parents every day that could be challenged as not being in their children’s “best interests.” See Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (“[W]e have recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized- [But] [s]imply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state.”).
Second, I respectfully submit that the dissent overlooks the necessity of harm or potential harm to children as a prerequisite to action by the State of Alabama in the following matters that it references: (1) termination of parental rights, (2) dependency proceedings, (3) custody proceedings, (4) adoption proceedings, and (5) abortions sought by minors.
In the first two of these — dependency and termination of parental rights — the law is clear that the State may not act unless the child is dependent upon the State for care and supervision. As the dissent notes, § 12-15-314(a)(4), Ala.Code 1975, expressly provides for a “best interests” determination by a court only “ ‘after adjudicating a child dependent.’ ” 73 So.3d at 680 (quoting D.B. v. K.B., 67 So.3d 114 (Ala.Civ.App.2011)). See Ala. Code 1975, § 12-15-102(8) (describing the circumstances that warrant a finding of dependency). Of course, parental rights *670 cannot be terminated absent a showing that the parent is either unable or unwilling to fulfill his or her parental obligations toward a child, i.e., that the parent has placed the child at risk of serious harm or is unable to protect the child from such harm. See Ala.Code 1975, § 12-15-319.
As for the reference in the dissent to custody disputes, to the extent that reference is made in relation to custody disputes between two fit parents, the authority cited there is inapposite. As to a custody dispute between a parent and a third party, if the third party is to prevail there must be a showing of either “ ‘voluntary forfeiture of [parental rights or] ... that the parent ... is guilty of ... misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.’ ” Ex parte Terry, 494 So.2d at 632 (quoting Ex parte Mathews, 428 So.2d at 59). See also Ex parte Berryhill, 410 So.2d 416, 417 (Ala.1982) (concluding that the Court of Civil Appeals had applied the wrong legal standard and, rather than respecting the prima facie right of the natural parent by merely inquiring as to whether the natural parent was fit, had gone a step further and had erroneously inquired into who, as between the natural parent and a nonparent, was “the fittest of the two for custody of the child” (emphasis added)).
As to adoption proceedings, the State cannot and does not reach the decision whether the adoption is in the best interest of the child until after the child’s natural parent either has consented or the parental rights of that parent have been terminated. See above regarding the standard for termination of parental rights.
Finally, a court cannot decide that it is in a child’s best interest to obtain an abortion without the consent of her parent unless there is evidence supporting one of the following allegations:
“a. That the petitioner is sufficiently mature and well enough informed to intelligently decide whether to have an abortion without the consent of either of her parents or legal guardian.
“b. That one or both of her parents or her guardian has engaged in a pattern of physical, sexual, or emotional abuse against her, or that the consent of her parents, parent or legal guardian otherwise is not in her best interest.”
Ala.Code 1975, § 26-21-4(d)(4). The intrusion on parental rights reflected by these statutory provisions is premised, by mandate of precedent from the United States Supreme Court, on the notion that the abortion decision is of a “unique nature” so far as the child’s constitutional rights are concerned, Bellotti v. Baird, 443 U.S. 622, 642, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (“[T]here are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible.”).[22]
*671 In the penultimate paragraph of the dissent, there is reference to the court’s intervening “to protect the rights of children ” and of “protecting a child if an adult has disregarded his or her responsibility toward that child.” 73 So.3d at 685. I am unfamiliar with any holding by any court at any time to the effect that a child has a “right” to visit with his or her grandparent. Nor am I familiar with any holding of any court at any time to the effect that a parent has a legal “responsibility” to not make a decision that is not in the best interests of his or her child. I have no doubt that my parents did so on many occasions; I have no doubt that, as a parent, I have done so on many occasions. Mistakes are part of parenting, not a basis for intervention by the government unless they rise to a level of causing the parent to be deemed unfit to continue in that role. “The fundamental liberty interest of natural parents in the care, custody, and management of them child does not evaporate simply because they have not been model parents.... ” Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
Finally, the dissent criticizes the main opinion for purportedly “focus[ing] on the rights of the parents rather than on the best interests of the children.” 73 So.3d at 678. In addition to the legal principles discussed above that are fully responsive to this criticism, I would add that this criticism fails to take into consideration that a parent’s legal rights in relation to a child are linked to and correlative of the parent’s fulfillment of legal duties toward the child.
“As the duty of support and protection to the infant, and responsibility to society for the government of the family, and the right to the care and custody of the child, and the ordering of the family, are correlative and dependent the one upon the other, if the law has taken away the rights, the duties from which the rights result, and to the performance of which the rights are essential, are abrogated; and the child is then left without lawful protectors, and society is without any security for the proper performance of important social duties.”
People ex rel. Brooks v. Brooks, 35 Barb. 85, - (N.Y.Sup.1861). Unless a parent fails to satisfy, or is not in a position to satisfy, his or her obligations to a child, the State has no basis for intruding upon the parent’s rights in relation to the care, custody, and control of the child. See Chandler v. Whatley, 238 Ala. 206, 209, 189 So. 751, 754 (1939) (describing “the natural and legal relations between parent and child” as being “interwoven with life and liberty”); Rhodes v. Lewis, 246 Ala. 231, 20 So.2d 206 (1944) (explaining that the law does not presume that “the best interests of the child” exist in a conceptual vacuum separate from the natural rights of the parents).[23]
*672 III.
If parents have not voluntarily forfeited their parental rights or been deemed unfit, the law assumes that they want what is best for their children. The law assumes that, if a fit custodial parent restricts his or her child’s association with some person, even a grandparent, the parent has a valid reason for doing so and need not defend that reason to the government. It would be naive and dangerous — and antithetical to many hundreds of years of Western thought — to view the state as possessing some moral high ground or inherently superior ability to decide a child’s best interest. As between fit parents and the state, we must let parents parent their children.
Based on the foregoing, I join the majority of this Court — seven Justices, including those who concur only in the re-suit — in concluding that § 30-3^4.1 is unconstitutional on its face.

. In addition to looking out for a child as to whom visitation might be sought, parents are called upon every day to make decisions that simultaneously affect not just a single child, but siblings of that child and the parent's spouse. What is best for one child may not be best for others, or it may be seriously inconvenient or even detrimental for the family as a whole. Also, a parent must often weigh short-term harm against long-term harm. Perhaps a short-term adversity will work to benefit a child by developing a sense of sacrifice for the greater good of the family, or patience, or perseverance. Or perhaps the short-term harm of hurt feelings would be better than a long-term wound caused by an adversary proceeding where the parent is forced to openly disclose concerns about a grandparent.

. Of course, despite the well founded presumption that parental decision-making is motivated by the best interests of the child, not every parental decision meets this standard. The thought of empowering the government to explore and evaluate the subjective motivations of parents and their decisions, however, is even more alarming than the thought of empowering the government to second-guess the effects of parental decisions.

. Similarly, all the Justices on the Alabama Supreme Court recognize today the fundamental nature of the parents’ right to the care, custody, and control of their children.

. As discussed in the opinion of the Court of Civil Appeals in this case, Virginia's Supreme Court is only one of a great majority of courts throughout the nation that have rejected a mere "best interests” standard and explained that the Constitution requires a showing of harm and/or other "compelling" state interest. E.H.G. v. E.R.G., 73 So.3d 614, 626 (Ala.Civ.App.2010).

. With respect to the constitutional requirement that any intrusion into parental decision-making regarding children's associations must be narrowly tailored to the least restrictive means necessary to address the state's interest, I made the following observations in R.S.C.:
"Overnight and other unsupervised 'visitation' removes children from the presence and control of their parents and gives complete control and authority over the child for a period of time to another adult, essentially effecting a temporary or ‘partial custody.' Parents’ interests in the nurture, upbringing, companionship, care, and custody of their children are thus implicated in ways that they are not with occasional, supervised visits. In Troxel, itself, the plurality made special note of the fact that there was 'no allegation that [the parent] ever sought to cut off visitation entirely,' but simply preferred to restrict visitation to 'one short visit per month and special holidays.’ 530 U.S. at 71, 120 S.Ct. 2054. At trial, the parent asked the court to order 'only one day of visitation per month (with no overnight stay) and participation in the Granville family’s holiday celebrations.’ Id. at 71, 120 S.Ct. 2054. The Supreme Court criticized the trial court's 'failure to accord significant weight to [the parent’s] already having offered meaningful visitation ' in this regard to the grandparents. Id. at 72, 120 S.Ct. 2054.”
R.S.C., 812 So.2d at 369-70 (some emphasis omitted; footnotes omitted).

. In L.B.S., I suggested that the "substantial harm” necessary to justify state interference in the decisions of a parent regarding visitation with others would be "serious psychological or emotional harm." 826 So.2d at 191. I also suggested that it is the "net effect” (i.e., weighing the advantages and disadvantages of the visitation decision against one another) of the court's substitution of its decision for that of the parent that must be considered in this regard. As to these two suggestions, I wrote as follows:
”1 am acutely aware that, in many cases, where a child has enjoyed a substantial relationship with a grandparent, arbitrarily depriving the child of the relationship could cause the child serious psychological or emotional harm.[8] In In re Custody of Smith, [137 Wash.2d 1, 969 P.2d 21 (1998),] the Washington Supreme Court also recognized that arbitrarily depriving a child of a substantial relationship with a third person could cause 'severe psychological harm.’ 137 Wash.2d at 20, 969 P.2d at 30. See also Troxel, 530 U.S. at 99, 120 S.Ct. 2054 (Kennedy, J., dissenting). No showing of harm was required by the Washington statute at issue, however, and the court cited Washington state law for the proposition that ‘a state can only intrude upon a family’s integrity pursuant to its parens patriae right when "parental actions or decisions seriously conflict with the physical or mental health of the child.” ' 137 Wash.2d at 18, 969 P.2d at 29 (citation omitted; emphasis added). See also Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); Wisconsin v. Yoder, 406 U.S. 205, 230, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).
"Parents often are called upon to decide between competing alternatives, each of which may entail both benefits and detriments for their children. I conclude that a court may not constitutionally substitute its decision for that of a fit custodial parent as to what, if any, grandparent visitation is in a child’s overall best interest, unless the net effect of the court’s substituting its decision for that of the parent’s will be to prevent substantial harm to the child.
"I also note that Ala.Code 1975, § 30-3-4.1, allows a court to override the decision of a parent and order what the court may deem to be 'reasonable' visitation. The statute does not expressly state that the court may order only visitation narrowly tailored to address an adjudged harm. Yet, as noted previously, the interference with a fundamental right for the purpose of serving a compelling state interest must be done in a manner that is least restrictive of the fundamental right and most closely tailored to serve that compelling state interest. See Washington v. Glucksberg, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); Beagle v. Beagle, 678 So.2d [1271,] at 1275 [(Fla.1996)] (recognizing in the context of a challenge to Florida's grandparent-visitation statute that the statute must meet a compelling state interest ‘through the use of the least intrusive means’). Limiting a court’s interference with parental authority to the extent necessary, or reasonably necessary, to prevent or alleviate the adjudged harm would result in less interference with parental authority. Compliance with such a requirement conceivably could entail adjustments to the number or duration of visits, limitations on the nature of the visitation (e.g., a restriction of visitation to supervised visits only) and/or to other conditions or restrictions.

" 8 In Borsdorf v. Mills, 49 Ala.App. 658, 275 So.2d 338 (1973), this court affirmed a trial court’s judgment awarding custody of a child to foster parents over the objection of his natural mother. The child had been removed from the custody of his mother at an age of less than two years and was 'taken into a home [the foster parents’] and given the same comfort, love and affection over a period of two and a half years which was given to the natural children in the home.' 49 Ala.App. at 661, 275 So.2d at 341. This court explained that to remove the child 'from the only home and parents he knows and send him to an uncertain future in a distant state with strangers, even though one be a natural parent, could not avoid being [a] traumatic experience which could be calculated to be extremely damaging.' Id.
" '[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays "in promoting] a way of life” through the instruction of children as *668 well as from the fact of blood relationship.’
“Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). See also Rideout v. Riendeau, 761 A.2d 291 (Me.2000) (upholding finding that grandparents had acted as children's parents for significant periods of time, and holding that a statute requiring a sufficient existing relationship between grandparents and children in order for grandparents to petition for visitation served a compelling state interest and was narrowly tailored to serve that interest).”
L.B.S., 826 So.2d at 191-92 (footnote omitted).

"2 This 'opening' may, for example, be wide enough to allow the application of § 30-3-4.1 to cases in which a grandparent has served for a significant period as a child’s de facto parent, so that depriving the child of a continuing relationship with that grandparent would cause serious psychological or emotional harm to the child. See L.B.S.[ v. L.M.S.], 826 So.2d [178] at 191-92 n. 8 and accompanying text (AIa.Civ.App.2002) (Mur-dock, J., concurring in the judgment of reversal only).”

. Even aside from the question of a "voluntary forfeiture,” if a parent is willing to subject a child to the type and severity of psychological harm that can result from the abrupt and complete removal of the child from the custody of the only parent figure he or she has known for some extended period, one may reasonably question the fitness of that parent to have sole custody of that that child. See generally Ex parte Terry, 494 So.2d at 632 (quoting Mathews, 428 So.2d at 59). Compare D.C. v. C.O., 721 So.2d 195 (Ala.Civ.App.1998); R.K. v. R.J., 843 So.2d 774 (Ala.Civ.App.2002).

. By the same token, the issue of parental rights vis-a-vis the authority of the State, if any, to mandate grandparent visitation based upon the government’s determination of what is in the “best interests of the child” is a different matter entirely from each of that litany of things that are discussed by the dissent and that include the following: (1) whether the State may treat a child like an adult for purposes of a criminal proceeding arising out of the child's conduct or for purposes of the child's interactions with police officers; (2) whether the State may impose age limits concerning the purchase or consumption of alcohol, the operation of a motor vehicle, and the ability to enter into a marriage contract; (3) whether the State may, over a parent's objection, provide "medical care or treatment for a child when the care or treatment is necessary to prevent or remedy serious harm to the child,” Ala.Code 1975, § 26-14-7.2(b), or waive the requirement of *671 parental consent to an abortion procedure; and (4) whether the State can require the payment of child support for children who are not yet adults. See 73 So.3d at 679-80 (Main, J., dissenting).
In each of the above-described instances (1) the child or the child's interests either are being seriously harmed or are at risk of serious harm and (2) the need for the State’s intervention to address that harm or risk of harm is the result of the child’s immature decision-making skills or concerns about the parents willingness or ability to protect the child. Section 30-3-4.1, Ala.Code 1975, reflects no such considerations.

. Essentially, the dissent appears to equate the state’s right to intervene for purposes of protecting a child from harm (an obligation that normally falls upon the parents) with the state's right to intervene based solely upon what it perceives to be in a child’s best interests. Although the former is founded in the common-law doctrine of parens patriae and reflects a normal function of the state’s police *672 power, the latter finds no substantial basis in our law. See 1 William Blackstone, Commentaries on the Laws of England *452 (footnotes omitted; citations omitted); William Mac-pherson, A Treatise on the Law Relating to Infants 106-111 (1843); 2 Joseph Story, Commentaries on Equity Jurisprudence in England and America § 1341 (1886). See also Wisconsin v. Yoder, 406 U.S. 205, 230, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (rejecting the State's attempt to support application of a compulsory high-school-attendance law to Amish children, stating: "This case, of course, is not one in which any harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred. The record is to the contrary, and any reliance on that theory would find no support in the evidence.” (footnote omitted; emphasis added)); R.J.D. v. Vaughan Clinic, P.C., 572 So.2d 1225, 1227-28 (Ala.1990) ("The common law deems parental care for children not only an obligation, but also an inherent right: 'In such matters as deciding on the need for surgical or hospital treatment, the wishes of young children are not consulted, nor their consent asked when they are old enough to give expression thereto. The will of the parents is controlling, except in those extreme instances where the state takes over to rescue the child from parental neglect or to save its life....’ 59 Am.Jur.2d. Parent and Child § 48 at 194 (1987).” (some emphasis omitted; some emphasis added)). See Ex parte Department of Mental Health, 511 So.2d 181, 185 (Ala.1987) (The juvenile court system " 'is rooted in the concept of parens patriae, that the state will supplant the natural parents when they fail in that role.' In re F.C., 484 S.W.2d 21, 25 (Mo.App.1972).” (emphasis added)); Prince v. State, 19 Ala.App. 495, 495, 98 So. 320, 320 (1923) (" ‘The provision of the statute [for juvenile detention] is a provision by the state, under necessity, as parens patri-ae, for the custody of neglected children, incorrigible, or criminally inclined children, and is intended to supply to them that parental custody and care and restraint which their welfare, and the interests of the state in the welfare of the children, require, which parental custody, or the parental right to the custody, the parents have for any reason surrendered or lost.' " (quoting 1 Wharton's Criminal Law 473 (11th ed.))); see also G.H. v. Cleburne County Dep’t of Human Res., 62 So.3d 540, 544 (Ala.Civ.App.2010) (Department of Human Resources acts as parens patriae when it files a dependency petition); Ex parte State ex rel. Echols, 245 Ala. 353, 17 So.2d 449 (1944).