# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 28, 2011 Session

## SANDY GREEN
### v.
## VIRGINIA EVANS

**Appeal from the Circuit Court of Williamson County**
**No. 08232      Robbie T. Beal, Judge**

---

**No. M2011-00276-COA-R3-CV - Filed March 30, 2012**

---

This is a grandparent visitation case.  The child at issue was adjudicated dependent and neglected; the appellant paternal great-grandmother was awarded legal custody.  Months later, the child's mother died.  The appellee maternal grandmother then filed a petition in juvenile court seeking both custody and alternatively grandparent visitation.  The order denying the grandmother's petition was appealed to the circuit court for a *de novo* hearing.  The circuit court denied the  grandmother's petition for custody, but awarded grandparent visitation.  The custodian great-grandmother now appeals. We reverse and dismiss the grandmother's petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which  ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Deana C. Hood, Franklin, Tennessee for Respondent/Appellant Virginia Evans.

John Michael Garrett, Nashville, Tennessee for Petitioner/Appellee, Sandy Green.

Karen D. Huddleston Johnson, Brentwood, Tennessee as Guardian Ad Litem.

## OPINION

### FACTS AND PROCEEDINGS BELOW

The child at issue in this case, Jordan ("Jordan"), was born in 2002 to Juanita Ayers ("Mother"). Mother had significant substance abuse problems. In 2003, when Mother was pregnant with Jordan's younger sister, Mother, Jordan, and Jordan's father ("Father")[1] moved into a home near Father's grandmother, Jordan's great-grandmother, Respondent/Appellee Virginia "Rosie" Evans ("Ms. Evans"). After that, Jordan began essentially living with Ms. Evans, but saw Mother and Father regularly. When Jordan visited with Mother, he would often be in contact with his maternal grandmother, Petitioner/Appellee Sandy Green ("Ms. Green"). Ms. Green helped care for Jordan during Jordan's visits with Mother.

The litigation that is the subject of this appeal began on May 30, 2006, when Ms. Evans filed a petition in the Juvenile Court of Williamson County to declare Jordan a dependent and neglected child and to designate herself as the legal custodian. Shortly after that, Ms. Green filed a competing petition for custody of Jordan. On August 22, 2006, Jordan was declared to be a dependent and neglected child.[2] Custody was awarded to Ms. Evans, and Mother was given supervised visitation with Jordan at Ms. Evans' discretion. Ms. Green was not awarded separate visitation, but Mother's visits with Jordan were often supervised by Ms. Green.

The order granting custody to Ms. Evans prompted a tangle of litigation in which both Mother and Ms. Green filed multiple pleadings, including petitions for custody and numerous motions, such as motions to transfer, for contempt, to modify visitation, and the like.[3] A guardian ad litem, attorney Karen D. H. Johnson ("GAL"), was appointed for Jordan and his younger sisters.

---

[1]Jordan's father was apparently not involved in the proceedings in this case and is not at issue in this appeal.

[2]Jordan's two younger sisters were likewise found to be dependent and neglected. Custody of the sisters was litigated separately. The record indicates that the sisters' father (not Jordan's father) was eventually awarded legal custody of them.

[3]In October 2006, the juvenile court entered an order prohibiting either Mother or Ms. Green from filing further motions for contempt against Ms. Evans without leave of the Juvenile Court.

On May 15, 2007, Mother died in a car accident.[4] A week later, on May 23, 2007, Ms. Green filed another petition seeking custody of Jordan.[5] Ms. Green's petition was later amended to request, in the alternative, visitation with Jordan pursuant to Tennessee's grandparent visitation statute, Tennessee Code Annotated § 36-6-306. After a hearing, the juvenile court found that, after Mother's death, Ms. Evans had continued allowing Ms. Green to visit with Jordan, and therefore there was no severance or cessation of the grandparent/grandchild relationship within the meaning of Section 36-6-306. On this basis, the juvenile court found that the statute did not apply. The juvenile court dismissed Ms. Green's requests for both custody and visitation.

Unsatisfied with the visitation arrangements offered to her by Ms. Evans, Ms. Green appealed the juvenile court's dismissal of her petition.[6] The appeal went to the Circuit Court of Williamson County, for *de novo* proceedings. ***See*** Tenn. Code Ann. § 37-1-159(a) (2010). In the ensuing procedural maneuvering, Ms. Evans filed a motion to dismiss, arguing that (1) Ms. Green had no standing because she never filed a motion to intervene; (2) the grandparent visitation statute was inapplicable because it applies only when a parent has custody, and only where that parent has denied visitation, and (3) the grandparent visitation statute did not apply because there was no severance or cessation of Ms. Green's relationship with Jordan.

Pending a ruling on Ms. Evans' motion to dismiss, an agreed order was entered giving Ms. Green some visitation rights with Jordan, with certain limitations. As Ms. Green had visitation with Jordan's younger half-sisters, Ms. Green agreed to coordinate her visits with Jordan so that Jordan could visit with his sisters while visiting at Ms. Green's home. In addition, Ms. Green agreed to avoid scheduling visits to conflict with Jordan's extracurricular activities. The agreed order stated that Ms. Evans and Ms. Green were to have no contact with one another. Eventually, the trial court denied Ms. Evans' motion to dismiss insofar as it asserted that Ms. Green did not have standing because she had not filed a motion to intervene.

A variety of disputes followed. Ms. Green alleged that Ms. Evans discouraged her court-ordered visitation and sought more. Ms. Evans asserted that Ms. Green was not coordinating Jordan's visits so that he could see his younger siblings, as required by the agreed order.

---

[4]The record indicates that Mother was under the influence of alcohol when the accident occurred.

[5]According to Ms. Green, this is the petition from which this appeal arises.

[6]The juvenile court's dismissal of Ms. Green's petition was initially appealed to this Court. This Court held that, because the matter arose from a dependency and neglect proceeding, the appeal should have been to the circuit court rather than to the Court of Appeals. The appeal was then transferred to the Circuit Court of Williamson County, pursuant to Tenn. Code Ann. § 16-4-108(a)(2) (2009).

After Ms. Green's husband, Mike Green ("Mr. Green"), was accused of sexually molesting Jordan's two young sisters, and consequently was prohibited from contact with the sisters, Ms. Evans sought an injunction prohibiting Mr. Green from being present for Jordan's visits. After Ms. Green punished Jordan by pulling down his pants in the presence of his sisters and striking his naked bottom with a belt, Ms. Evans sought an order suspending Ms. Green's visitation. Ms. Green responded by filing a motion to require Jordan and his sisters to submit to a psychological examination by Ms. Green's expert.

In response to these disputes, the trial court briefly suspended Ms. Green's visitation. It then amended the *pendente lite* order to resume Ms. Green's visitation, provided it was supervised by Terry Thompkins, Ms. Evans' son and Jordan's grandfather ("Mr. Thompkins"), and Mr. Green was not present for the visits. The trial court also ordered Ms. Evans, Ms. Green, and Jordan to undergo counseling. Janie Berryman, Ed.D. was retained as the court-appointed counselor.

The trial began on September 22, 2010. It centered on Ms. Green's petition for custody of Jordan or, in the alternative, for court-ordered grandparent visitation pursuant to Tennessee's grandparent visitation statutes. At the outset, Ms. Green submitted the testimony of a psychologist who opined that her husband, Mr. Green, did not exhibit a sexual interest in children.[7] In his testimony, Mr. Green said that he had tried to clear himself of the allegation that he sexually abused Jordan's young sisters, but conceded that he was still enjoined from having any contact with the girls.[8] Jordan's GAL informed the trial court that the Child Protective Services investigation of the sexual abuse charges against Mr. Green was truncated prior to reaching any conclusion, for reasons unrelated to whether the charges were well-founded.

Ms. Evans was called by Ms. Green to testify. At the time of trial, Ms. Evans was seventy-nine years old and in good health. She testified that Mr. Thompkins lives with her, and she and Mr. Thompkins are Jordan's parental figures. Ms. Evans said that Jordan began living with her at a very young age, when Mother was pregnant with one of Jordan's younger half-sisters. At that time, Mother and Jordan's father lived near Ms. Evans' home, and she saw them frequently and assisted them. After Jordan was declared dependent and neglected and Ms. Evans was designated as his legal custodian, Ms. Evans said, she continued to facilitate Jordan's visits with Mother and Ms. Green. Ms. Evans maintained that she had never stopped allowing Ms. Green to visit with Jordan after Mother's untimely death, even when

---

[7]The psychologist claimed an accuracy rate of between 74% and 81% on his testing of Mr. Green's sexual interest in children.

[8]In his testimony, Mr. Green did not expressly deny the sexual abuse.

there was no court order requiring her to do so. Ms. Evans was questioned extensively about the dates on which visits occurred, the disputes with Ms. Green over the frequency, schedule, and conditions placed on the visits, and the protracted legal proceedings. Ms. Evans said that she agreed with Ms. Green on a set visitation schedule in the hopes of ending the ongoing litigation, but that it did not work. She said that Ms. Green kept them in court "constantly."

Ms. Evans said that the incident in which Ms. Green pulled down Jordan's pants and whipped him in front of his sisters was humiliating for Jordan. She felt that Mr. and Ms. Green were psychologically abusive to Jordan.[9] On more than one visit, Ms. Evans said, Ms. Green had permitted Jordan to be with persons with whom the court had prohibited contact, such as Ms. Green's husband, Mr. Green, and a substance-abusing friend of Mother. She described Ms. Green as "very controlling" and indicated that Ms. Green spoke to Jordan in derogatory terms about Ms. Evans and Mr. Thompkins. Ms. Evans said that the court-ordered visitation with Mr. Green interfered with Jordan's numerous extracurricular activities.

Overall, Ms. Evans said, Jordan perceived Ms. Green as "mean," was afraid of Mr. and Ms. Green, and did not want to visit Ms. Green. However, Jordan enjoys the opportunity to spend time with his sisters.

Ms. Evans said that, absent a court order, she was agreeable with Ms. Green visiting with Jordan, under certain conditions. Specifically, Ms. Evans said that she would permit Jordan to continue to visit Ms. Green "as long as she treats him with [the] respect that she expects him to treat her with," and provided Mr. Green was not present during Jordan's visits, no corporal punishment was used, and the schedule of visits did not unduly interfere with Jordan's extracurricular activities. Ms. Evans reaffirmed that she has no intention of cutting Ms. Green off from having contact with Jordan.

Mr. Thompkins testified, largely corroborating Ms. Evans' testimony. He described the daily routine for he and Ms. Evans in caring for Jordan, and said that Jordan "loves [Ms. Evans] like a mother" and tells Mr. Thompkins "every day" that he loves Mr. Thompkins as well. Mr. Thompkins said: "Jordan is my primary focus. He is my number one concern in this world." Mr. Thompkins said Jordan "has stated that to me many times, that he is scared of Ms. Green" and wants Mr. Thompkins present when he must visit her. He noted that Jordan loves his sisters and enjoys seeing them during visits with Ms. Green, but does not want to visit Ms. Green if his sisters will not be there.

---

[9] During the corporal punishment episode, Ms. Evans said, Ms. Green told Jordan he would die and go to hell, and on another occasion, Mr. and Ms. Green told Jordan and his sisters that if they did not do as they were told, they might "get burned up."

Ms. Green testified on her own behalf. She said that she had had contact with Jordan since his birth and helped change his diapers and feed him when he was still in Mother's custody. She said she and Jordan "had a good relationship just up until the death of my daughter." Ms. Green introduced into evidence copious notes on the dates of all of her visits with Jordan, some of which occurred during the time period after Mother's death in May 2007 and prior to her petition seeking grandparent visitation. Ms. Green documented several occasions on which she called Ms. Evans to schedule a visit with Jordan and Ms. Evans did not return her call, although she conceded that some of those calls may have been returned by Ms. Evans' son, Mr. Thompkins. She admitted that there were some occasions on which she was offered visitation but declined. Ms. Green testified that there had only been two periods of time in which she went for as much as two months without seeing Jordan and both were due to the heated legal proceedings.

In her testimony, Ms. Green accused Ms. Evans of telling Jordan to hit her because she had kissed him. She testified at length from her notes about dates on which her visits were moved from one weekend day to another, the discussions with Mr. Thompkins surrounding each such change, and all of the dates on which visits occurred. Ms. Green did not believe the claims by Jordan's sisters that her husband Mr. Green sexually abused them, but acknowledged that the GAL and the sisters' counselor both believe the sisters' claims about her husband. She also insisted that Jordan's statements to Ms. Evans about psychologically abusive remarks she had supposedly made to him were untrue, and that Jordan's assertion that she had struck him on his bare bottom as corporal punishment was untrue. Ms. Green conceded that Jordan's sisters had told their father that they witnessed the corporal punishment of Jordan; Ms. Green ascribed that to a collaboration among the adults to poison the children's minds against her. Ms. Green claimed that Jordan had been "talked into . . . saying stuff" and that was the basis of her allegation that he was suffering severe emotional harm. She asserted that she and Jordan love each other and that Ms. Evans had alienated him from her.

Finally, the court-appointed counselor, Dr. Berryman, testified. She said that she had met numerous times with Ms. Green, Ms. Evans, Mr. Thompkins, and Jordan, individually and in different combinations. Dr. Berryman described Jordan's bonds with Ms. Evans and Mr. Thompkins as "very close," and said that Jordan sees them as his parental figures. She described Jordan's emotional ties with Ms. Green as "tentative." Dr. Berryman said that she understood her role as court-appointed counselor as to improve, build, and "establish a relationship" between Jordan and Ms. Green.

Dr. Berryman testified that Jordan reported to her the incident in which Ms. Green inflicted corporal punishment on him by striking his bare bottom. Despite Ms. Green's denials of the corporal punishment, Dr. Berryman said, Jordan was "adamant that she did it." She said

Jordan describes Ms. Green as "mean" and does not want to visit her by himself. Visiting with Ms. Green every other weekend without supervision, she said, "would be overwhelming and traumatic to him." She said that, overall, it was important to Jordan to see his sisters and he views seeing Ms. Green with his sisters "as a positive thing." However, Dr. Berryman said, Jordan had not told her that he loves Ms. Green or that he wants to see Ms. Green without his sisters present. Overall, she opined, a cessation of Jordan's relationship with Ms. Green would not "be a great loss" to him and would not create a danger of substantial harm to him. Dr. Berryman said that Ms. Evans and Mr. Thompkins had both indicated they would involve Ms. Green in Jordan's life and agree to visits so long as they could be worked around Jordan's schedule. However, she said, Ms. Green's refusal to believe the sexual abuse charges against Mr. Green caused them to be concerned that they could not trust Ms. Green "to follow the rules." Asked about the effect on Jordan of changing custody from Ms. Evans to Ms. Green, Dr. Berryman said repeatedly, "that would be devastating to him."

At the conclusion of the proof, the attorneys gave closing remarks. Ms. Green's attorney argued that the parties' ill will had "spilled over" to Jordan. Ms. Evans' attorney argued that the grandparent visitation statute was not applicable and even if it were, the requirements of the statute had not been proven. The GAL agreed with counsel for Ms. Evans that the requirements of the grandparent visitation statute had not been met. Based on her knowledge of Jordan and the parties in this case, the GAL said: "Court-ordered visitation hasn't worked." The GAL asked the trial court to deny Ms. Green's request for court-ordered grandparent visitation.

The trial court took a brief recess and then issued an oral ruling. It first rejected Ms. Green's petition for a change in custody, finding that her request for custody "never was a true issue." Moving on to the request for grandparent visitation, the trial court found that Ms. Evans, as the legal guardian, was the equivalent of a custodial parent under the grandparent visitation statute. It noted that under Tennessee law, for a grandparent to receive court-ordered visitation, there are "significant hurdle[s]," and recited the statutory requirement that there be a severance or cessation of the relationship between the grandparent and the child as the first of these hurdles. The trial court then ruled as follows:

> . . . [T]o effectively stop or cease visitation it can be – it can take all forms . . . in this particular case I think there have been some significant road blocks that Ms. Evans has thrown up in the effective attempt to cease meaningful visitation. . . . [t]he testimony would dictate and her testimony was that [Ms. Evans] believes that she wants to continue a pattern of visitation and that she wants to keep Ms. Green in this child's life, the Court just doesn't put a lot of faith in that statement . . . if you look at the acrimonious relationship that has existed between these two parties since the child's birth . . . . I don't believe

-7-

it takes a rocket scientist to sit on this bench and to say these parties aren't particularly fond of each other, and I don't think that can be erased by Ms. Evans coming up on the stand and saying, you know, I'm going to do my best. The Court just doesn't have proof of that.

The trial court acknowledged that the proof showed that, during times in which Ms. Green did not have court-ordered visitation, "Ms. Evans has been there to try to facilitate some visitation and . . . Ms. Green may not have always been overly receptive to it." It stated, however, that "these parties really haven't been out of court enough . . . to assess a history of their attitude," and surmised that, in the absence of a court order, "I do not believe that there would be a good faith attempt to keep Ms. Green in this child's life." The trial court brushed off Ms. Evans' concerns about the court-ordered visits interfering with Jordan's schedule, commenting, "I hear that at least two or three times a week." It acknowledged that Ms. Green had provided Ms. Evans with reasons for not trusting Ms. Green, including the incident of corporal punishment, the allegations of sexual abuse against Mr. Green, and Ms. Green's past violations of the juvenile court's orders. Nevertheless, the trial court found that "there has been an effective cessation" of Ms. Green's relationship with Jordan, by Ms. Evans.

The trial court considered next whether Ms. Green had a substantial relationship with Jordan within the meaning of the grandparent visitation statute. It disregarded Dr. Berryman's testimony because she "was attempting to quantify this attachment between Ms. Green and [Jordan] as of basically today's date." Instead, the trial judge, recalling his prior involvement in the case as a juvenile court referee, said it was "more appropriate [to] . . . look back to August 2006," prior to Mother's death, when Ms. Green saw Jordan with Mother. The trial court found that there was "a significant bond" between Ms. Green and Jordan at that time.

From that, the trial court concluded that "emotional harm will come to this child if there is not a relationship that is continued between Ms. Green and the child." Acknowledging Dr. Berryman's testimony that Jordan would not suffer emotional harm from severance of his relationship with Ms. Green, the trial court dismissed it, saying "that can really be said for just about every seven-year-old child." Explaining his conclusion that there was a danger of substantial harm to Jordan if the relationship with Ms. Green ended, the trial court said:

> [W]hen you have a child who's lost his mother, when you have a . . . father [who] is, for all accounts and purposes, out of the picture, he's clinging to a great grandmother for support, he's clinging [to] a grandfather for some support; obviously he needs to have that other side of the family, that other grandparent at least in the picture. He needs, quite frankly, as much family as he can get to rely on, and I think in the long run if this Court didn't protect the

relationship between Ms. Green and the child that it would have an emotional toll on the child. It may not manifest itself in the next week, it may not manifest itself in the next year, it may not manifest itself over the next decade, but ultimately it would have a ramification, and I think that's the Court's responsibility here.

On this basis, the trial court found the required element of danger of substantial harm.

In considering the best interest of the child, the trial court noted that it "may not be the biggest fan of Ms. Green" and that the trial judge "has a hard time trusting Ms. Green." Despite this, the trial court held:

But Ms. Green has not been such an inappropriate or improper figure in this child's life that would suggest to the Court that it is not [in the child's] best interest for this child to maintain a relationship with Ms. Green or with that family.

The trial court then ordered a schedule of visitation for Ms. Green that was supervised at first and then increased and modified to unsupervised overnight visitation. Despite the unresolved accusations of sexual abuse, the trial court allowed Mr. Green to fully participate in Ms. Green's visitation.

On October 28, 2010, the trial court entered an order to the same effect, denying Ms. Green's petition for custody but granting her request for grandparent visitation under Tennessee Code Annotated § 36-6-306. The trial court found that Ms. Evans "has attempted to cease meaningful contact and visitation between [Jordan] and Ms. Green" and an "acrimonious relationship has existed" between Ms. Evans and Ms. Green "since the birth of [Jordan]." The order outlined the trial court's visitation plan, with visitation increasing to overnight visitation one night a month at Ms. Green's home. Ms. Evans now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Ms. Evans argues overall that the trial court erred in granting court-ordered visitation to Ms. Green under Tennessee's grandparent visitation statute. She argues, *inter alia*, that Ms. Green does not have standing because she did not file a motion to intervene, that Tennessee Code Annotated § 36-6-306 is not applicable because Ms. Evans is not a "custodial parent," that there was no cessation of the relationship between Ms. Green and Jordan, that Ms. Green did not have a substantial relationship with Jordan, and that the visitation and the schedule of visitation is not in Jordan's best interest.

-9-

The GAL filed an appellate brief on behalf of Jordan, also arguing that the trial court erred in awarding Ms. Green court-ordered grandparent visitation. The GAL's arguments are consistent with those of Ms. Evans on appeal.

Ms. Green argues that the requirements of the grandparent visitation statute were proven and that the trial court should be affirmed.

This appeal results from an appeal from the juvenile court ruling that was reviewed *de novo* by the circuit court. Thus, we treat it as a review of the ruling of the circuit court. This Court reviews a trial court's findings of fact *de novo*, presuming those findings of fact to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***Rawlings v. John Hancock Mut. Life Ins. Co.,*** 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). This Court gives great weight to a trial court's determinations on the credibility of witnesses. ***Estate of Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997). "When issues of credibility and weight of testimony are involved, we afford considerable deference to the trial court's findings of fact." ***Larsen-Ball v. Ball***, 301 S.W.3d 228, 235 (Tenn. 2010).

Appellate review of a question of law, including an issue of statutory construction, is *de novo* with no presumption of correctness. ***Smallwood v. Mann,*** 205 S.W.3d 358, 361 (Tenn. 2006); ***State v. Tait***, 114 S.W.3d 518, 521 (Tenn. 2003) (citing ***Beare Co. v. Tenn. Dep't of Revenue***, 858 S.W.2d 906, 907 (Tenn. 1993).

### ANALYSIS

On appeal, Ms. Evans argues *inter alia* that Ms. Green does not have standing to assert a claim for grandparent visitation because she did not seek to intervene in the original juvenile court proceedings. We perceive the determinative issues to be whether the grandparent visitation statute, Tennessee Code Annotated § 36-6-306, is applicable and whether the statutory requirements were proven, so on appeal we assume *arguendo* that the trial court correctly held that Ms. Green is not procedurally barred from her claim because she failed to intervene.[10]

The statute at issue, Tenn. Code Ann. § 36-6-306, provides as follows:

> (a) Any of the following circumstances, when presented in a petition for grandparent visitation to the circuit, chancery, general sessions courts with domestic relations jurisdiction or juvenile court in matters involving children born out of wedlock of the county in which the petitioned child currently

---

[10]In this appeal, we do not rule on the issue of whether intervention by Ms. Green was necessary.

resides, necessitates a hearing if such grandparent visitation is opposed by the custodial parent or parents:

> (1) The father or mother of an unmarried minor child is deceased;
>
>  . . . .
>
> (6) The child and the grandparent maintained a significant existing relationship for a period of twelve (12) months or more immediately preceding severance of the relationship, this relationship was severed by the parent . . . for reasons other than abuse or presence of a danger of substantial harm to the child, and severance of this relationship is likely to occasion substantial emotional harm to the child.

(b) (1) In considering a petition for grandparent visitation, the court shall first determine the presence of a danger of substantial harm to the child. Such finding of substantial harm may be based upon cessation of the relationship between an unmarried minor child and the child's grandparent if the court determines, upon proper proof, that:

> > (A) The child had such a significant existing relationship with the grandparent that loss of the relationship is likely to occasion severe emotional harm to the child;
> >
> >  . . . .
> >
> > (C) The child had a significant existing relationship with the grandparent and loss of the relationship presents the danger of other direct and substantial harm to the child.
>
> (2) For purposes of this section, a grandparent shall be deemed to have a significant existing relationship with a grandchild if:
>
>  . . . .
>
> > (C) The grandparent had frequent visitation with the child who is the subject of the suit for a period of not less than one (1) year.
>
> (3) A grandparent is not required to present the testimony of affidavit of an expert witness in order to establish a significant existing relationship with a grandchild or that the loss of the relationship is likely to occasion severe emotional harm to the child. Instead, the court shall consider whether the facts of the particular case would lead a reasonable person to believe that there is a significant existing relationship between the grandparent and grandchild or that the loss of the relationship is likely to occasion severe emotional harm to the child.

(4) For the purposes of this section, if the child's parent is deceased and the grandparent seeking visitation is the parent of that deceased parent, there shall be a rebuttable presumption of substantial harm to the child based upon the cessation of the relationship between the child and grandparent.

(c) Upon an initial finding of danger of substantial harm to the child, the court shall then determine whether grandparent visitation would be in the best interests of the child based upon the factors in § 36-6-307. Upon such determination, reasonable visitation may be ordered.

(d) (1) Notwithstanding the provisions of § 36-1-121, if a relative or stepparent adopts a child, the provisions of this section apply.

Tenn. Code Ann. § 36-6-306 (2010).[11]

Some background on grandparent visitation is helpful. The decisions of the U.S. Supreme Court and the Tennessee Supreme Court, interpreting the federal and state constitutions, explicitly prohibit any judicial assumption that grandparent/grandchild relationships always benefit the child, as contrary to the parents' fundamental right to raise their children as they see fit. *See Troxel v. Granville*, 530 U.S. 57, 66-72 (2000) (recognizing parents' fundamental constitutional right to make decisions on care, custody and control of children, finding trial court erred in presuming grandparent visits are in best interest of children); *Hawk v. Hawk*, 855 S.W.2d 573, 577-82 (Tenn. 1993) (recognizing parents' fundamental constitutional right, finding trial court engaged in "sentimental" commentary on grandparents and erred in "unquestioning judicial assumption" that grandparent-grandchild relationship always benefits child, basing award of grandparent visitation on that presumed benefit). To avoid such an assumption, the Tennessee constitution and Tennessee's grandparent visitation statute require a grandparent seeking visitation to prove, as a threshold requirement, that the child will be in danger of substantial harm if visitation is not ordered by the court. *Hawk*, 855 S.W.2d at 581; Tenn. Code Ann. § 36-6-306(b)(1). Both the federal constitution and Tennessee's grandparent visitation statute require the petitioning grandparent to show that visitation was opposed or denied in order for the court to consider ordering visitation. *Troxel*, 530 U.S. at 71 (trial court erred in giving no weight to fact that parent had assented to some grandparent visitation under certain conditions); *Huls v. Alford*, No. M2008-00408-COA-R3-CV, 2008 WL 4682219, at *7-8 (Tenn. Ct. App. Oct. 22, 2008) (in light of parents' fundamental right, Tennessee grandparent visitation statute "is not implicated" unless visitation is denied or opposed). Under *Troxel*, pursuant to the federal constitution, in all

---

[11]Subsection (b)(4), providing for a rebuttable presumption of substantial harm if the child's parent is deceased and the grandparent seeking visitation is the parent of the deceased parent, was not added until 2010, but was in effect at the time of the decision of the trial court in this case.

phases of a proceeding on grandparent visitation, there is a presumption that a fit parent is acting in the child's best interest, and the court must accord special weight to the parent's determinations. *Troxel*, 530 U.S. at 68, 70 (plurality opinion) ("there is a presumption that fit parents act in the best interests of their children.") (if a fit parent's decision on grandparent visitation "becomes subjected to judicial review, the court must accord at least some special weight to the parent's own determination.").

Against this backdrop, we consider the trial court's order granting Ms. Green's petition for visitation and the evidence in the record.

### *"Parent" Under Grandparent Visitation Statute*

Ms. Evans argues first that the grandparent visitation statute is not applicable because Jordan is in the custody of his legal guardian, not his "parent." Specifically, Ms. Evans notes that Section 36-6-306(a) states that a hearing on a petition for grandparent visitation is necessitated only "if such grandparent visitation is opposed by the *custodial parent or parents . . . .*" Because Ms. Evans is not a "parent," she contends that the grandparent visitation statute is not applicable.

In response, Ms. Green argues that the trial court correctly held that Ms. Evans, as the legal guardian, should be considered a "parent" within the meaning of the term as it is used in Section 36-6-306. To hold otherwise, Ms. Green contends, would render the statute inoperative where the child is in the custody of someone other than a "parent." She cites a definition of "parent" in *Black's Law Dictionary* that includes an individual or agency that has been designated as the child's legal guardian.[12] She also cites *In re Sidney J.*, 313 S.W.3d 772 (Tenn. 2010), in which the maternal grandparents were awarded visitation with a child in the custody of the paternal grandparents.[13]

We find *In re Sidney J.* inapposite. In that case, both sets of grandparents sought to adopt the child. *Id.* at 776-79. Only after the Court affirmed the grant of the paternal grandparents'

---

[12]We note that the definition in the edition of *Black's Law Dictionary* cited by Ms. Green states only that "parent" means the "lawful mother or father of a person." It adds that "*by statute*" the term "has been defined to include" a legal guardian. **See** *Black's Law Dictionary* 1114 (6th ed. 1990) (definition of "parent").

[13]In the alternative, Ms. Green argues that, if Section 36-6-306 is not applicable because Ms. Evans is not a "parent," she is entitled to grandparent visitation under a straight "best interests" analysis pursuant to Tenn. Code Ann. § 36-6-302, which governs grandparent visitation for a child who has been removed from the "child's parents, guardian or legal custodian." Tenn. Code Ann. § 36-6-302(a). This statute appears inapplicable on its face because Jordan remains in the custody of his legal guardian, Ms. Evans.

adoption petition did it address the issue of visitation by the maternal grandparents. *Id.* at 778-79. Thus, at the point at which grandparent visitation was decided, the paternal grandparents were the child's adoptive parents. Therefore, the issue presented in this case was not presented in *In re Sidney J.*.

Respectfully, we are not persuaded by the *Black's Law Dictionary* definition of "parent" cited by Ms. Green. While the grandparent visitation statute does not define "parent," other Tennessee statutes that define the term include only a biological, legal or adoptive parent. *See, e.g.*, Tenn. Code Ann. § 36-1-102(36) (2010); Tenn. Code Ann. § 36-1-102(28)(E) (2010) (defining "legal parent"). Moreover, numerous other Tennessee statutes refer explicitly to a child's parent *or legal guardian*. *See, e.g.*, Tennessee Code Annotated §§ 37-1-174(a) (2010); 37-10-303(a)(1) (2010); 49-6-7003 (2009). In contrast, Section 36-6-306(a) refers only to opposition to visitation by a "parent" or severance of the grandparent-grandchild relationship by a "parent." Tenn. Code Ann. § 36-6-306(a) and (a)(6).

Ms. Green cites no case holding that the term "parent" in Section 36-6-306 includes a legal guardian, and we have found none. If the legislature had intended Section 36-6-306 to apply to situations in which a grandchild is in the custody of a legal guardian, it would have said so expressly in the statute. It did not.

We conclude that the term "parent," as used in Section 36-6-306, does not include a legal guardian such as Ms. Evans. Therefore, we find that the grandparent visitation statute is inapplicable in this case.

### *Remaining Issues*

Although our holding that the term "parent" does not include a legal guardian is sufficient to decide this appeal, our detailed review of the record in this cause raised serious concerns about the trial court's application of the grandparent visitation statute to the facts and evidence presented at trial. In light of these concerns, we feel compelled to depart from our normal practice and briefly address several of the remaining issues raised on appeal.

On appeal, Ms. Evans argues that the proof at trial did not show that Ms. Evans "opposed" visitation by Ms. Green. We agree. It is undisputed that Ms. Evans stated repeatedly that she did not oppose Ms. Green's visits, and it is likewise undisputed that regular visitation took place.[14] Even Ms. Green conceded that she never went any longer than two months without

---

[14]Ms. Green argues that Ms. Evans attempted to alienate Jordan from her. In a dispute between parents, if a custodial parent acts to alienate the child from the non-custodial parent, this can be a basis for changing

(continued...)

seeing Jordan. The trial court's ruling referred to unspecified "significant road blocks that Ms. Evans has thrown up in the effective attempt to cease meaningful visitation." However, any conditions Ms. Evans placed on Ms. Green's visitation were appropriate and responsive to the circumstances. The circumstances included the incident of corporal punishment, the report that Mr. Green had sexually abused Jordan's sisters, and Ms. Green allowing Jordan to be in contact with persons who were prohibited by court order from being around him. In response, Ms. Evans briefly suspended visits and then agreed to regular visits supervised by Mr. Thompkins. She also wanted Jordan's visits with Ms. Green to be coordinated with the visits by Jordan's sisters, and scheduled around Jordan's activities.[15] These were all reasonable conditions to visitation, and cannot be considered opposition to visitation.

In addition, citing the "acrimonious relationship" between Ms. Green and Ms. Evans, the trial court declined to credit Ms. Evans' testimony that she is not opposed to visitation, saying that the trial court "just doesn't have proof of that." This is erroneous first because the burden of proof is on the grandparent who seeks visitation. Second, any "acrimonious relationship" between Ms. Evans and Ms. Green is clearly rooted in Ms. Green's substantial misconduct. Third, Ms. Evans continued to facilitate Ms. Green's visitation even when there was no court order in place. Finally, even if the trial court declined to credit Ms. Evans' statements that she did not oppose visitation, this does not constitute *affirmative* evidence that Ms. Evans is opposed to Ms. Green's visitation. Thus, we find no evidence to support the trial court's finding of opposition to visitation.

Next, we conclude that the trial court's ruling on substantial harm was erroneous. First, from the trial judge's oral ruling, it appears that he based his finding of substantial harm in part on his recollection of proceedings in the juvenile court, from his prior position as a juvenile court referee. These juvenile court proceedings were not made part of the circuit court record. If the trial judge relied on his memory of proceedings before him when he was a juvenile court referee, this was erroneous.

Second, the overwhelming evidence that *was* presented in the circuit court indicated that *no* harm would come to Jordan from the cessation of court-ordered visits with Ms. Green. Dr. Berryman, Ms. Evans, Mr. Thompkins, and the GAL all indicated that Jordan views Ms.

---

[14](...continued)
custody to the non-custodial parent. Ms. Green cites no precedent for applying this principle in a grandparent visitation dispute.

[15]The trial court was dismissive of Ms. Evans' desire to schedule visits to minimize the impact on Jordan's activities, and seemed to compare it to visitation scheduling disputes between parents. We note that grandparent visitation disputes are not comparable to visitation disputes between parents. *Smallwood v. Mann*, 205 S.W.3d 358, 361-63 (Tenn. 2006).

Green as "mean," is not attached to her, does not want to visit her except to see his sisters, and feels unsafe alone with her. Ms. Green put on no evidence at all that Jordan would suffer any harm from the cessation of their relationship. Despite the lopsided evidence, the trial court found a danger of substantial harm to Jordan from ending the court-ordered visitation. This finding appears to have been based on exactly the type of "sentimental" and "unquestioning judicial assumption" of the benefit to the child of the grandparent/grandchild relationship that the Tennessee Supreme Court in *Hawk*, and the United States Supreme Court in *Troxel*, expressly disavowed.[16] To find substantial harm, there must be supporting evidence in the record that is specific to this child's relationship with this grandparent.[17] We find no such evidence in this record.

Finally, Ms. Evans and the GAL argue that the trial court erred in finding that visitation with Ms. Green was in Jordan's best interest, particularly its order that Jordan have overnight visitation with Ms. Green. We agree.[18] The trial court's best interest ruling is contrary to virtually all of the evidence in the record. The evidence indicated clearly that Jordan did not want to visit Ms. Green by himself, and had ample reason to feel that way. Dr. Berryman said that overnight visitation would be "overwhelming and traumatic" for Jordan. The GAL stated flatly: "Court-ordered visitation hasn't worked" and asked the trial court to end it.

The trial court cited the acrimony in the relationship between Ms. Evans and Ms. Green as a justification for ordering visitation. However, hostility between the grandparent and the parent militates *against* ordering grandparent visitation, because it places the child in the center of family conflict. Courts have cautioned that "forced grandparent visitation should not be used as a means for ending family disharmony." *E.H.G. v. E.R.G.*, 73 So. 3d 614, 630 (Ala. Civ. App. 2010). Moreover, Ms. Green has demonstrated a propensity for keeping the family under the constant burden of litigation, and court-ordered visitation provides her the opportunity to continue her litigiousness. In short, the record contains no support for the trial court's finding on best interest.

---

[16]The trial court said that Jordan "needs to have that other side of the family, that other grandparent at least in the picture . . . ." This could only have been a sentimental assumption; there is no evidence to support it.

[17]Dr. Berryman testified specifically that Jordan would not suffer emotional harm if his relationship with Ms. Green were discontinued. The trial court rejected this specific testimony from the court-appointed counselor with a generalization: "that can really be said for just about every seven-year-old child."

[18]We are particularly alarmed that the trial court lifted any restrictions as to Mr. Green being present for Jordan's visits with Ms. Green, even overnight visits. The sexual abuse charges against Mr. Green were never resolved, and the trial court appeared to place the burden on Ms. Evans to prove it occurred. This decision was unwise and very concerning to this Court.

All other issues raised on appeal are pretermitted.

## CONCLUSION

The decision of the trial court is reversed and the petition of Appellee Sandy Green is dismissed in its entirety with prejudice. Costs on appeal are assessed against Appellee Sandy Green, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE